664 A.2d 34

**John C. NORTH, II, Chairman, et al.**

v.

**KENT ISLAND LIMITED PARTNERSHIP.**

**No. 1228, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Aug. 31, 1995.

Thomas A. Deming, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Marianne D. Mason and Judith F. Plymyer, Asst. Attys. Gen., on the brief), Annapolis, for appellants.

Warren K. Rich (William D. Evans, Jr. and Rich and Henderson, P.C., on the brief), Annapolis, for appellee.

Argued before FISCHER, CATHELL and HARRELL, JJ.

FISCHER, Judge.

Appellant/Cross–Appellee, Chesapeake Bay Critical Area Commission ("Critical Area Commission" or the "Commission"), appeals from an order of the Circuit Court for Queen Anne's County directing it to hold a contested case hearing on the request of Appellee/Cross–Appellant, Kent Island Limited Partnership ("Pier One"), for a redesignation of a portion of its property in the critical area from limited development area (LDA) to intensely developed area (IDA), on the grounds of mistake in the original mapping.

The Critical Area Commission asks us to decide the following question:

I. Did the trial court err in finding that a determination of the Critical Area Commission under Nat.Res.Md.Ann.Code, § 8–1809 is subject to the contested case provisions of State Government Md.Ann.Code., § 10–205?

Pier One cross-appeals and asks us to address the following questions:

II. Was the Panel's [of the Critical Area Commission] determination supported by substantial evidence?

III. Did the Circuit Court err in granting the motion to strike?

IV. (a). Did the Circuit Court err in not determining the extent of jurisdiction of the Chesapeake Bay Critical Area Commission with regard to individual case by case adjudication and the standard of review to be applied?

(b). Has there been an invalid delegation of legislative authority?

## BACKGROUND

In 1984, the Maryland General Assembly enacted Chapter 794, Laws of 1984, entitled the "Chesapeake Bay Critical Area Protection Program," which is codified in Md.Code (1974, 1990 Repl. Vol., 1994 Cum.Supp.), §§ 8–1801–1816 of the Natural

Resources Article.[1] The purposes of the General Assembly were:

(1) To establish a Resource Protection Program for the Chesapeake Bay and its tributaries by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats; and

(2) To implement the Resource Protection Program on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight.

Section 8–1801(b).

In order to achieve these purposes, the General Assembly created the Chesapeake Bay Critical Area Commission. Each local jurisdiction [2] has the primary responsibility for developing and implementing a program [3], subject to review and approval by the Commission. Section 8–1808(a). The Commission was required to "adopt by regulation on or before December 1, 1985 criteria for program development and approval, which are necessary or appropriate to achieve the standards stated in subsection (b) of this section." Section 8–1808(d) [4].

---

1. All references are to Md.Code (1974, 1990 Repl.Vol., 1994 Cum. Supp.), §§ 8–1801—1816 of the Natural Resources Article, unless otherwise noted.

2. "Local jurisdiction" means a county, or a municipal corporation with planning and zoning powers, in which any part of the Chesapeake Bay Critical Area, as defined in this subtitle, is located. § 8–1802(a)(7).

3. "Program" means the critical area protection program of a local jurisdiction and includes any amendments to the program. § 8–1802(a)(8).

4. § 8–1808(b) provides:
 (b) *Goals of Program.*—A program shall consist of those elements which are necessary or appropriate:
 (1) To minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands;
 (2) To conserve fish, wildlife, and plant habitat; and

Section 8–1809 addresses the approval and adoption of the local critical area protection programs. Each local jurisdiction is required to advise the Commission whether it plans to "develop a critical area protection program to control the use and development of that part of the Chesapeake Bay Critical Area located within its territorial limits." Section 8–1809(a)(1). If the local jurisdiction chooses not to develop a program, the Commission is permitted to prepare and adopt a program for the critical area located in that local jurisdiction. Section 8–1809(b). If the local jurisdiction decides to develop a program, the local jurisdiction must prepare and submit the program to the Commission. Section 8–1809(c). Within 30 days after the program is submitted, the Commission is required to appoint a panel of five of its members to conduct a public hearing in the jurisdiction on the proposed program. Section 8–1809(d)(1). Within 90 days after the Commission receives a proposed program, the Commission shall approve the proposal or notify the local jurisdiction of any specific changes required for the proposal to be approved. If the Commission does neither, the program is deemed approved. Section 8–1809(d)(2). Each local jurisdiction is to review its entire program and propose any necessary amendments to its entire program, including local zoning maps, at least every four years. Section 8–1809(g). In addition, local jurisdictions may propose program amendments [5] as often as necessary, but not more than four times per calendar year. Section 8–1809(h). "Except for program amendments or program re-

---

(3) To establish land use policies for development in the Chesapeake Bay Critical Area which accommodate growth and also address the fact that, even if pollution is controlled, the number, movement, and activities of persons in that area can create adverse environmental impacts.

**5.** (9)(i) "Program amendment" means any change to an adopted program that the Commission determines will result in a use of land or water in the Chesapeake Bay Critical Area in a manner not provided for in the adoptive program.

(ii) "Program amendment" includes a change to a zoning map that is not consistent with the method for using the growth allocation contained in an adopted program.
§ 8–1802(a)(9).

finements developed during program review under subsection (g) of this section, a zoning map amendment may be granted by a local approving authority only on proof of a mistake in the existing zoning." Section 8–1809(h)(2)(i).[6] The Commission must approve any program amendments. Section 8–1809(i). Section 8–1809(j) provides that the Commission shall approve programs and program amendments that meet: "(1) The standards set forth in § 8–1808(b)(1) through (3) of this subtitle; and (2) The criteria adopted by the Commission under § 8–1808 of this subtitle."

Pursuant to § 1808(d), the Commission promulgated regulations establishing the criteria for local critical area development. COMAR 27.01.02 (the "criteria"). The Commission recognizes three types of development areas: (1) Intensely Developed Areas;[7] (2) Limited Development Areas;[8] and (3)

---

6. This is distinguished from the general practice allowing a zoning amendment based on change of circumstances or mistake. *Stratakis v. Beauchamp*, 268 Md. 643, 652–653, 304 A.2d 244 (1973).

7. COMAR 27.01.02.03(A) provides:

Intensely developed areas are those areas where residential, commercial, institutional, and/or industrial, developed land uses predominate, and where relatively little natural habitat occurs. These areas shall have at least one of the following features:

(1) Housing density equal to or greater than four dwelling units per acre;

(2) Industrial, institutional, or commercial uses are concentrated in the area; or

(3) Public sewer and water collection and distribution systems are currently serving the area and housing density is greater than three dwelling units per acre.

8. COMAR 27.01.02.04 provides:

Limited development areas are those areas which are currently developed in low or moderate intensity uses. They also contain areas of natural plant and animal habitats, and the quality of runoff from these areas has not been substantially altered or impaired. These areas shall have at least one of the following features:

(1) Housing density ranging from one dwelling unit per 5 acres up to four dwelling units per acre;

(2) Areas not dominated by agriculture, wetland, forest, barren land, surface water, or open space;

(3) Areas meeting the conditions of Regulation .03A, but not .03B, above;

Resource Conservation Areas.[9] COMAR 27.01.02.02(A). Intense development is to be directed outside the Critical Area and future intense development is to be directed towards intensely developed areas. COMAR 27.01.02.02(B). Low intensity development is permitted in limited development areas, but subject to strict regulations. COMAR 27.01.02.02(C). In addition, development is to be limited in the resource conservation areas. COMAR 27.01.02.02(D). Each jurisdiction was to identify each of the three areas within its jurisdiction based on criteria and develop policies and programs to achieve the objectives proposed by the Commission. COMAR 27.01.02.02(E). The designation was made based on the land uses and development in existence on December 1, 1985. COMAR 27.01.02.07(C).

The Commission placed a cap on the growth of intense development and limited development areas. COMAR 27.01.02.06A provides:

> Intensely developed and limited developments areas may be increased subject to these guidelines:
>
> (1) The area of expansion of intensely developed or limited development areas, or both, may not exceed an area equal to 5 percent of the county's portion of the resource conservation area lands that are not tidal wetlands or federally owned.
>
> (2) When planning future expansion of intensely developed and limited development areas, counties, in coordination with affected municipalities, shall establish a process to accommodate the growth needs of the municipalities.

---

(4) Areas having public sewer or public water, or both.

**9.** COMAR 27.01.02.05 provides:

Resource conservation areas are those areas characterized by nature-dominated environments (that is, wetlands, forests, abandoned fields) and resource-utilization activities (that is, agriculture, forestry, fisheries activities, or aquaculture). These areas shall have at least one of the following features:

(1) Density is less than one dwelling unit per 5 acres; or
(2) Dominant land use is in agriculture, wetland, forest, barren land, surface water, or open space.

Growth allowed in each county's critical area under this provision is known as a county's "growth allocation." Section 8–1809(h)(2)(ii) provides:

The requirement in paragraph (2)(i) of this subsection that a zoning map amendment may be granted only on proof of a mistake does not apply to proposed changes to a zoning map that:

1. Are wholly consistent with the land classifications in the adopted program; or

2. Propose the use of a part of the remaining growth allocation in accordance with the adopted program.

The amount of growth allocation available to each local jurisdiction is five percent of the Resource Conservation Area. Redesignations based on mistake do not count against the county's growth allocation.

The Queen Anne's County critical area program was approved by the Critical Area Commission on June 29, 1988 and, as amended, on February 15, 1989. It was adopted as the comprehensive planning guide by the County Commissioners on March 15, 1989. It was designated as the Queen Anne's County Critical Area Protection Program (County Program).

## FACTS

Pier One owns approximately 52 acres of property on Kent Island at the southeastern end of the Chesapeake Bay Bridge in Queen Anne's County. Approximately 50 acres of the 52 acre property are within the Chesapeake Bay Critical Area. The critical area is divided into 28.84 acres of Intensely Developed Area and 21.3 acres of Limited Development Area.[10] The property is improved with a marina and non-residential structures including a restaurant. In order to make modifications to the property, in September of 1990,

---

10. The intense development and limited development areas are overlay zones superimposed over existing zones. Overlay zones are used to place property simultaneously in two zones. The record does not indicate the zoning for the underlying areas.

Pier One petitioned Queen Anne's County to amend the classification of the 21.3 acres of Limited Development Area to Intensely Developed Area. There were two ways in which the County could have redesignated the parcel: (1) The County could have redesignated the parcel based on a mistake in the original mapping; or (2) The County could have redesignated the parcel based on the use of the County's growth allocation.

Pier One petitioned Queen Anne's County Board of Commissioners ("County Commissioners") for a redesignation of a portion of its property in the critical area, from limited development area (LDA) to intensely developed area (IDA). Pier One based the petition on the fact that the LDA designation was a mistake within the contemplation of § 8–1809(h)(2). The County Commissioners referred the petition to the Queen Anne's County Planning Commission ("Planning Commission") for review. On January 10, 1991, the Planning Commission held a public hearing to determine if there was a mistake in the original mapping. Pier One presented testimony and exhibits. The Planning Commission concluded that a mistake had been made in the designation of the property and recommended in favor of the map amendment. The County Commissioners then submitted the redesignation as a proposed amendment to the Chesapeake Bay Critical Area Commission for approval as an amendment to the County's critical area program. The Critical Area Commission referred the amendment to a panel of five. On April 15, 1991, the panel of five held a public hearing with testimony and exhibits presented by Pier One, found no mistake in the mapping, and recommended against the amendment. Subsequently, there was a public meeting of the Critical Area Commission sitting as a whole. The panel chairman recommended that the Commission deny the petition. Pier One was not permitted to present any witnesses or testimony. The Critical Area Commission denied the amendment based on the panel report. As a result of the Commission's decision, the County Commissioners denied Pier One's petition for redesignation.

On July 5, 1991, Pier One requested, on substantive and procedural grounds, judicial review of the adverse rulings of

the Critical Area Commission and the County Commissioners. The Critical Area Commission moved to dismiss the appeal and to strike the constitutional issues raised in Pier One's opposition to the motion to dismiss. The circuit court granted the motion to strike the constitutional issues, denied the motion to dismiss, and reversed the Critical Area Commission's denial of redesignation. The circuit court remanded the case to the Critical Area Commission with instructions to hold a contested case hearing under the Maryland Administrative Procedure Act (MAPA). The circuit court agreed with Pier One's argument that LDA and IDA map designations are licenses issued by a state agency and therefore subject to the contested case hearing requirements of the MAPA. The circuit court did not address the substantive issues or the standard the Critical Area Commission should apply in reviewing the redesignation.

## DISCUSSION

The Commission argues that the circuit court erred in two respects. The first is that a Critical Area Commission determination concerning a local map amendment is a quasi-legislative action, not a quasi-judicial action of a state agency issuing a license under the APA. Second, a contested case hearing is not required by § 8–1809 or any other section. Pier One argues that the Commission's denial of the proposed map amendment was a quasi-judicial act requiring the due process protections afforded by the MAPA. It avers that the Commission's role was to resolve the issue of whether there was a mistake in the original mapping of the LDA portion of the Pier One property, through a contested case hearing as defined by Maryland's Administrative Procedure Act, Md.Code (1984, 1993 Repl.Vol.), §§ 10–201 through 10–217 of the State Government Article.

A "contested case" is defined by the MAPA as follows: § 10–201. Definitions.

\* \* \* \* \* \*

(c) *Contested Case.*—"Contested case" means a proceeding before an agency to determine:

(1) a right, duty, statutory entitlement, or privilege of a person that is required by law to be determined only after an opportunity for an agency hearing; or

(2) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by law to be determined only after an opportunity for an agency hearing.

When a proceeding meets the definition of a "contested case" the agency must provide trial type procedures. The MAPA "itself does not grant a right to a hearing. The right must come from another source such as a statute, a regulation, or due process principles." *Sugarloaf v. Waste Disposal,* 323 Md. 641, 652, 594 A.2d 1115 (1991) (citations omitted).

 There is nothing in § 8–1809 that requires a contested case hearing. In addition, "[t]he test to determine whether an action is legislative or administrative is whether the action is one making new law, i.e., an enactment of general application prescribing a new plan or policy, or is one which merely looks to or facilitates the administration, execution or implementation of a law already in force." *Prince George's County v. Silverman,* 58 Md.App. 41, 50, 472 A.2d 104 (1984). The actual acts of zoning and rezoning are quasi-legislative functions. *Hyson v. Montgomery County,* 242 Md. 55, 63, 217 A.2d 578 (1966). The Commission itself does not act as a zoning body. The power of the Commission is to adopt regulations and criteria as well as conduct hearings in connection with "policies, proposed programs, and proposed regulations or amendments to regulations." § 8–1806. The role of the Commission is quasi-legislative and does not encompass a contested case hearing.

The Commission, therefore, contends that the only purpose of its proceedings was to determine whether the County's proposed local program amendment met certain standards set forth in § 8–1808(b)(1)–(3) and the criteria for local program development adopted by the Commission. The Commission argues that this determination is part of its oversight respon-

sibility under § 8–1801(b)(2), to assure that, in proposing mapping amendments based on mistake, all local jurisdictions act "in a consistent and uniform manner subject to State criteria and oversight."

The initial question we must answer is who has jurisdiction to determine whether there was a mistake in the original mapping. Pier One argues that the Critical Area Commission resolved the disputed question of adjudicative fact as to whether the property was mistakenly designated LDA.

It is clear that the General Assembly did not wish to allow local jurisdictions to amend their local programs at will. As a safeguard, § 8–1809(h)(2)(i) provides that ". . . a zoning map amendment may be granted by a local approving authority only on proof of mistake." In response, Queen Anne's County adopted § 7008 of the County Program. Section 7008(B) of the County Program provides:

> The County Commissioners may from time to time change the development area classification of properties in the Critical Area where it is demonstrated that a mistake was made in the original designation or when growth allocation is used by the county. When proposing a change of development area classification, i.e., Intensely Developed Area (IDA), Limited Development Area (LDA) or Resource Conservation Area (RCA), other than by changing a classification through the Growth Allocation process, *the County Commissioners shall not approve amendments unless it is found that there was a mistake in the original classification* based on the application of the Method for Delineating Land Use Management Classification contained in the Queen Anne's County Critical Area Program *and the amendment is approved by the Critical Area Commission.* (Emphasis added.)

County Program § 7012 describes the procedures for map amendments. All proposed amendments "shall be referred to the Planning Commission for investigation and recommendation." The Planning Commission is to hold a public hearing at which parties of interest and citizens shall have an opportunity

to be heard. County Program § 7012(B). The Planning Commission is the body to decide initially whether there has been a mistake in the mapping. The Planning Commission is to forward its recommendations to the County Commissioners and request that the County Commissioners forward the application for map amendment to the Critical Area Commission. County Program § 7012(C). Once the Critical Area Commission approves the amendment pursuant to § 8–1809, "the County Commissioners shall hold a public hearing on the proposed amendments ... at which citizens in interest and citizens shall have an opportunity to be heard." County Program § 7012(C). The County Commissioners "shall not approve any amendment unless it finds that such amendment is consistent with the purposes contained in Section 8–1800, et seq. of the Natural Resources Article of the Annotated Code of Maryland, in the Queen Anne's County Critical Area Program, the Comprehensive Plan and this Ordinance." County Program § 7012(D). The role of the Critical Area Commission is to examine the amendment to determine whether the amendment is consistent with the criteria. In contrast to § 8–1809(h)(2)(i), which requires the *local approving authority* to make a finding of mistake,[11] § 8–1809(j) provides a separate standard of review to be applied. Section 8–1809(j) provides:

(j) *Standards for approval by Commission.*—The Commission shall approve programs and program amendments that meet:

(1) The standards set forth in § 8–1808(b)(1) through (3) of this subtitle; and

(2) The criteria adopted by the Commission under § 8–1808 of this subtitle.

The standards set forth in § 8–1808(b)(1) through (b)(3) are the goals of the Critical Area Program:

---

11. For a discussion on the standard used to determine whether there was a mistake in the existing zoning, *see Bellanca v. County Commissioners,* 86 Md.App. 219, 229–233, 586 A.2d 62, *cert. denied* 323 Md. 33, 591 A.2d 249 (1991).

(b) *Goals of program.*—A program shall consist of those elements which are necessary or appropriate:

(1) To minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands;

(2) To conserve fish, wildlife, and plant habitat; and

(3) To establish land use policies for development in the Chesapeake Bay Critical Area which accommodate growth and also address the fact that, even if pollution is controlled, the number, movement, and activities of persons in that area can create adverse environmental impacts.

It is not the role of the Commission to reexamine whether there was an actual mistake in the original zoning. To allow the Critical Area Commission to revisit the question of mistake would render meaningless the hearings before the Planning Commission and the County Commissioners. In addition, this would create a state level zoning board, which was not the intention of the General Assembly in establishing the Critical Area Commission. The Commission was designed to be an oversight committee. Section 8–1801(b)(2). The original drafting group considered forming the Commission as a permitting agency for all projects in the critical area. The drafting group concluded that such a role was undesirable because the Commission would become tangled in collisions with local agencies and developers over the specifics of particular projects. George W. Liebmann, *The Chesapeake Bay Critical Area Act: The Evolution of a Statute,* The Daily Record, April 20, 1985, at 1. The drafting group also considered constituting the Commission as an appeal board. Because this would impose substantial hearing burdens on the Commission and create a conflict between the Commission and local zoning boards, the group decided against such a provision. The drafting group also considered allowing an appeal directly to the Commission from the permit granting agency. The drafting group rejected this approach because it would either result in duplicative appeals or grant the Commission pendent jurisdiction to address issues which did not fall under its regulations. Because there was a need for the Commission

to check upon local permit determinations involving zoning and subdivision, the group drafted a provision granting the Commission the right to intervene at any stage of administrative, judicial, or other original proceeding concerning project approvals. Section 8–1812.

In this case, once the Planning Commission determined that there was a mistake in the original zoning, the program amendment should have been referred to the Critical Area Commission to determine whether it met the criteria. The Commission has jurisdiction to examine the rezoning and determine whether the rezoning meets the established criteria. The sole issue before the Commission should have been whether the property satisfies the definition of IDA as set forth in the criteria. Instead, the Critical Area Commission undertook an independent review to determine whether there was a mistake in the rezoning. This action was outside the scope of its power. The Commission has jurisdiction as the final arbiter of program changes, but does not have jurisdiction to review piecemeal rezoning. The legislative charge to the Critical Area Commission does not include the quasi-judicial function of evaluating whether there was a mistake in the original mapping. If the Commission determines that the amendment complies with the criteria, then the County Commissioners may change the development area classification if it is satisfied that there was an original mistake. If the amendment does not comply with the criteria, then the petition for reclassification must be denied.[12]

■ Once the County Commissioners decides either to grant or deny the amendment, either party may then appeal to the Circuit Court for Queen Anne's County. County Program § 7034. Even if the Commission determines that the amendment is consistent with the criteria, it still has standing

---

**12.** *See West Montgomery v. MNCPPC,* 309 Md. 183, 197, 522 A.2d 1328 (1987), where the Court of Appeals addressed another type of overlay zones—transfer of development rights (TDR). The Court noted that the hearing before the District Council "would involve the determination of legislative rather than adjudicative facts, and thus there would be no requirement for a trial type hearing."

to appeal the decision of the County Commissioners to grant the amendment. The Commission has the right to intervene at any time. Section 8–1812 provides, in pertinent part:

(a) In general.—After the Commission has approved or adopted a program, the chairman of the Commission has standing and the right and authority to initiate or intervene in any administrative, judicial, or other original proceeding or appeal in this State concerning a project approval in the Chesapeake Bay Critical Area.

\* \* \* \* \* \*

(c) Appeal authorized.—The chairman may appeal an action or decision even if the chairman was not a party to or is not specifically aggrieved by the action or decision.

See *North v. St. Mary's County,* 99 Md.App. 502, 507–08, 638 A.2d 1175, *cert. denied sub nom. Enoch v. North,* 336 Md. 224, 647 A.2d 444 (1994).

## CONCLUSION

The circuit court should remand this case to the Critical Area Commission so that the Commission may review the amendment to determine whether it meets the criteria for IDA designation. If it does, then the County Commissioners may either grant or deny the petition depending on how it is persuaded on the issue of mistake. At this point, the circuit court may review the record to determine whether the decision of the County Commissioners is supported by substantial evidence. Because the circuit court has not yet addressed this issue, we shall refrain from addressing it on appeal.

Because we answer the appellant/cross-appellee's question in the affirmative and reverse the decision of the circuit court, we need not address the issues on cross-appeal.

JUDGMENT REVERSED.

REMANDED TO THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY WITH INSTRUCTIONS TO REMAND TO THE CRITICAL AREA COMMISSION FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEE.