936 A.2d 374

TALBOT COUNTY

v.

TOWN OF OXFORD, et al.

No. 1509 Sept. Term, 2006.

Court of Special Appeals of Maryland.

Nov. 30, 2007.

Victoria M. Shearer (Daniel Karp, Karpinski, Colaresi & Karp, on the brief), Baltimore, MD, (Michael Pullen, Talbot County Attorney, on the brief), Easton, MD, for Appellant.

Marianne E. Dise (Douglas F. Gansler, Attorney General, on the brief), Annspolis, MD, David R. Thompson (Brynja M. Booth, Cowdrey, Thompson, and Karsten, on the brief), Easton, MD, (Richard A. DeTar, Demetrios G. Kaouris, Miles and Stockbridge, P.C., on the brief), Easton, MD, for Appellee.

Panel: *KENNEY, SHARER, WOODWARD, JJ.

* Kenncy, J. participated in the hcaring and conference of this case while an active membcr of this Court; hc participated in the adoption of this opinion as a rctired, specially assigned member of this Court.

SHARER, J.

In an effort to alter critical areas growth allocations within Talbot County and the Towns of Easton, Oxford, and St. Michaels, the Talbot County Commissioners enacted County Bill 933. The Department of Natural Resources, Critical Areas Commission for the Chesapeake and Atlantic Coastal Bays ("the Commission"), the entity whose approval is required to modify critical areas growth allocation, rejected Bill 933, and this litigation ensued.

Dissatisfied with the Commission's refusal to approve Bill 933 as a local program amendment to its Critical Area Program, appellant/cross-appellee, Talbot County ("the County"), filed suit in the Circuit Court for Talbot County seeking a declaratory judgment and a writ of mandamus. The County appeals from the circuit court's denial of its requested relief and raises two issues for our review, which, as slightly rephrased and reordered, are: [1]

1. Whether the Commission acted within the time prescribed by statute for accepting and processing Bill 933.

2. Whether the Commission's refusal to approve Bill 933 was beyond its legal authority and/or otherwise arbitrary and illegal.

In its cross-appeal, appellee/cross-appellant, the Town of Oxford, "submits that in addition to the reasons given by the Critical Area Commission, Bill 933 should be voided for additional reasons."

For the reasons that follow, we shall affirm the judgment of the circuit court. Since the Town of Oxford's cross-appeal issue is subsumed within our decision, we need not decide it separately.

---

1. In its brief, the County asked:
 1. Whether the Critical Area Commission failed to comply with state statutes regarding the processing of submissions?
 2. Whether the Critical Area Commission's refusal to approve Talbot County Bill 933 was outside its legal authority and otherwise arbitrary and illegal?

## FACTUAL and PROCEDURAL BACKGROUND

### Critical Areas Legislation

In 1984, the Maryland General Assembly enacted the "Chesapeake Bay Critical Area Protection Program" (the "Act"), codified in Md.Code Ann., Nat. Res. ("NR") §§ 8–1801 through 8–1817 (Repl.Vol.2000 & 2006 Supp.). The dual purpose of the Act was (1) to foster "more sensitive development activity for certain shoreline areas [of the Chesapeake Bay and its tributaries] so as to minimize damage to water quality and natural habitats," and (2) to implement a Statewide resource protection program "on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight." NR § 8–1801(b)(1) & (2).

To achieve these purposes, the Act required each local jurisdiction with lands in the "critical area"—those lands within 1,000 feet of the heads of tide of the Chesapeake Bay and its tributaries—to develop and implement a program designed to mitigate the impact of pollution, while accommodating future growth. NR §§ 8–1807(a)(2) and 8–1808(a). In an effort to ensure that each local jurisdiction administered the act in a consistent and uniform manner, the General Assembly created the Chesapeake Bay Critical Area Commission.[2] NR § 8–1803(a).

The Commission is responsible for overseeing the development and implementation of local land use programs for property located within the critical area. The authority of the Commission consists of "all powers necessary for carrying out the purposes of [the Act]," including, *inter alia*, the power to "adopt regulations and criteria" in compliance with State law, and to "conduct hearings in connection with policies, proposed

---

2. Effective June 1, 2002, the "Chesapeake Bay Critical Area Commission" became known as the "Critical Area Commission for the Chesapeake and Atlantic Coastal Bays." Chapter 433, Acts 2002.

programs, and proposed regulations or amendments to regulations." NR § 8–1806(a).

The Commission recognizes three types of development areas: [3]

(1) *Resource Conservation Area* ("RCA")—land characterized by natural environments dominated by wetlands, forests, and abandoned fields, COMAR 27.01.02.05A, which may only be developed at a rate of one residential unit per twenty acres. COMAR 27.01.02.0 5C(4);

(2) *Limited Development Area* ("LDA")—land containing some natural plant and animal habitats and characterized by low or moderate development (up to four dwelling units per acre), COMAR 27.01.02.04A and;

(3) *Intensely Developed Area* ("IDA")—area where developed land uses predominate, where little natural habitat exists, and where housing density equals or exceeds four dwelling units per acre. COMAR 27.01.02.03A; *see also* NR § 8–1808(c)(1).

Based upon the Commission's criteria, local jurisdictions are required to identify each of the three areas in its jurisdiction and develop policies and programs to achieve the Act's objectives. COMAR 27.01.02.02E.

To accommodate future growth in the critical area, each local jurisdiction is given a "growth allocation" consisting of a "number of acres of land in the Chesapeake Bay Critical Area ... that a local jurisdiction may use to create new intensely developed areas and new limited development areas." NR § 8–1802(a)(11). The amount of growth allocation available to a local jurisdiction is "calculated based on 5 percent of the total resource conservation area in a local jurisdiction ... at the time of the original approval of the local jurisdiction's program by the Commission, not including tidal wetlands or

---

**3.** These designations depended upon existing land use and development as of December 1, 1985. COMAR 27.01.02.07C.

land owned by the federal government[.]" NR § 8–1808.1(b)(1).

The approval, adoption, and amendment of local critical area protection programs is governed by NR § 8–1809.

Each local jurisdiction is required to advise the Commission whether it plans to "develop a critical area protection program to control the use and development of that part of the Chesapeake Bay Critical Area located within its territorial limits." Section 8–1809(a)(1). If the local jurisdiction chooses not to develop a program, the Commission is permitted to prepare and adopt a program for the critical area located in that local jurisdiction. Section 8–1809(b). If the local jurisdiction decides to develop a program, the local jurisdiction must prepare and submit the program to the Commission. Section 8–1809(c). Within 30 days after the program is submitted, the Commission is required to appoint a panel of five of its members to conduct a public hearing in the jurisdiction on the proposed program. Section 8–1809(d)(1). Within 90 days after the Commission receives a proposed program, the Commission shall approve the proposal or notify the local jurisdiction of any specific changes required for the proposal to be approved. If the Commission does neither, the program is deemed approved. Section 8–1809(d)(2). Each local jurisdiction is to review its entire program and propose any necessary amendments to its entire program, including local zoning maps, at least every four years. Section 8–1809(g).[4] In addition, local jurisdictions may propose program amendments[5] as often

---

**4.** Pursuant to Chapters 431 and 432, Acts 2002, both effective June 1, 2002, NR § 8–1809(g) now requires that a local jurisdiction "review its entire program and propose any necessary amendments to its entire program ... at least every 6 years."

**5.** As defined in NR § 8–1802(a)(16):

(i) "Program amendment" means any change or proposed change to an adopted program that is not determined by the Commission Chairman to be a program refinement.

as necessary, but not more than four times per calendar year. Section 8-1809(h).

*North v. Kent Island Ltd. P'ship,* 106 Md.App. 92, 97, 664 A.2d 34 (1995).

"A program may not be amended except with the approval of the Commission." NR § 8-1809(i).

## Application of Critical Areas Legislation in Talbot County

In accordance with the requirements of NR § 8-1809, the Towns of Easton, Oxford, and St. Michaels submitted local critical area programs to the Commission for review and approval. The Commission approved Easton's plan on May 18, 1988, Oxford's plan on March 8, 1988, and St. Michaels' plan on June 1, 1988. Talbot County submitted its own proposed critical area program to the Commission, which was approved on August 13, 1989.

The County's local program provided, *inter alia:*

Not more than 1,213 acres of the Critical Areas of the County, including all land lying within the Critical Area within incorporated towns, shall be reclassified from the Rural Conservation (RC) District (or town zoning districts established for the Resource Conservation Area of the Critical Area) to any other zoning district. Of these 1,213 acres, 155 acres is reserved for the Town of Easton, 195 acres is reserved for the Town of Oxford, 245 acres is reserved for the Town of St. Michaels for growth allocation associated with annexations, and 618 acres is reserved for the County.

Talbot County Code ("TCC") § 190-109D(9).

Three planning maps were included "showing anticipated growth areas around the towns of Easton, Oxford, and St. Michaels." The County's critical area ordinance further pro-

(ii) "Program amendment" includes a change to a zoning map that is not consistent with the method for using the growth allocation contained in an adopted program.

vided that the number of reserved acres allocated to the Towns "should be reviewed by the County and Towns by June 1, 1993 for possible reallocation and at least every four years thereafter." TCC § 190–109D(11).

## Bill 762

In 1999, the County cooperated and coordinated with the Towns of Easton, Oxford, and St. Michaels in drafting Talbot County Bill 762, which created a process for the Towns to request, and the County to award, "supplemental" growth allocation. "Supplemental growth allocation" is acreage required for potential development within a municipality after the Town has exhausted its initial allocation of growth reserved for the Town in 1989. By its terms, Bill 762 did not apply to Oxford and St. Michaels because neither town had exhausted the initial growth allocation. The Commission approved Bill 762 in July 2000 as a change to Talbot County's Critical Area program. The bill gave the County joint review, in conjunction with affected municipalities, over supplemental awards of growth allocation to municipalities.

## Bill 933

On December 23, 2003, the Talbot County Council enacted Bill 933. It is that enactment that led to the instant litigation.

Although the original 1989 County critical area ordinance, as well as the Critical Area Law, provided for local program review every four years, Bill 933 was the first comprehensive review and revision of the County's local program since it was adopted in 1989. Bill 933 purported to change the way the towns regulated critical area growth allocations for lands within their boundaries by, *inter alia*, repealing planning maps 1, 2, and 3, and eliminating the reserved growth allocations for the Towns of Easton, Oxford, and St. Michaels. Bill 933 further provided that growth allocation awarded to any of the three towns that was "unutilized" on the effective date of the Bill would revert to the County.[6] The bill neither made

---

6. "Unutilized" growth allocation includes acreage already awarded by a town, unless the growth allocation has "resulted in actual physical

provision to accommodate the future growth of the Towns, nor provided any process that could be used to accommodate future growth in the Towns.

Despite its legal obligation to work "in coordination with affected municipalities" to establish "a process to accommodate the [municipal] growth needs," and its prior cooperation with the towns in drafting Bill 762, the County had no discussions with officials of the Towns of Easton, Oxford, or St. Michaels before introducing and enacting Bill 93 3. CO-MAR 27.01.02.06A(2).

## Commission Review of Bill 933

As required, the County submitted Bill 933 to the Commission on December 29, 2003. In response to Commission staff, the County provided additional information, along with Bill 933, to the Commission in a letter dated January 19, 2004. By letter of February 5, 2004, the Commission accepted Bill 933 for review and processing.

As required by NR § 8–1809(o)(1), the Commission appointed a five-member panel, which conducted a public hearing on Bill 933, in Easton, on March 24, 2004. The panel received numerous public comments on the proposed amendment. Thereafter, the panel met in public sessions on April 7, April 19, and May 5, 2004, to discuss Bill 933. Prior to the meetings, each member of the panel received a copy of all public comments submitted before the close of the record on April 5, 2004. Panel members also received information on the growth allocation processes of the Towns of Easton, Oxford, and St. Michaels, including copies of their respective critical area programs/ordinances.

At its April 19, 2004 meeting, the panel reviewed the growth allocation processes of other county and municipal critical area programs. The panel received information from Commission staff that no county, other than Talbot, had changed its

commencement of some significant and, visible construction ... which has occurred pursuant to a validly issued building permit." Bill 933 § 2.1(a).

original growth allocation procedures. The panel also undertook a review of the impact of Bill 933 on each of the Towns' approved critical area programs. The panel observed, *inter alia*, that the Towns' critical area programs were largely premised on the Towns controlling a specific amount of growth allocation acreage to award within the municipal boundaries.

The panel continued its deliberations on May 5, 2004, at which it reviewed the impact of Bill 933 on specific development projects which had already received growth allocation from the Towns. The panel discussed that, under Bill 933, growth allocation awarded by a town that had not yet resulted in "actual physical commencement of some significant and visible construction . . . pursuant to a validly issued building permit" would revert to the County.

The Town of St. Michaels, originally allocated 245 acres, had awarded 21 acres for the Strausburg subdivision, which the Commission approved as a change to St. Michaels' program in October 2003.[7] Also in 2003, St. Michaels awarded 70.29 acres of growth allocation for the Miles Point III Project, which the town submitted to the Commission as a proposed Town critical area program amendment. The Town of Oxford had received 195 acres of growth allocation in 1989, and had awarded 15.223 of those acres as of 2004.

By May of 2004, Easton had used all of the 155 acres of growth allocation originally reserved for it in 1989. In fact, Easton had awarded an additional 28.762 acres of "Supplemental" growth allocation from the County under the process established in 2000 by Bill 762.[8] The Town of Easton assigned part of this supplemental growth allocation to the Cooke's

---

7. The Strausburg growth allocation was approved as a "refinement." A program "refinement" is "any change or proposed change to an adopted program that the Commission Chairman determines will result in a use of land or water . . . in a manner consistent with the adopted program, or that will not significantly affect the use of land or water in the critical area." NR § 8–1802(a)(17)(i).

8. This award of supplemental growth allocation increased "the acreage reserved to the Town of Easton from 155 to 311 acres[.]"

Hope Project, which had been approved by the Town, but not yet approved by the Commission, as an amendment to Easton's program. Because the Cooke's Hope Project had not yet been constructed, the awarded growth allocation would be considered "unutilized" under Bill 933. Thus, the panel believed that Easton's award of growth acreage to the Cooke's Hope Project might also revert to the County.

The panel noted in its report that the Strausburg Subdivision and Miles Point III in St. Michaels clearly qualified as projects "for which growth allocation has been awarded by [the Town of St. Michaels], but under Bill 933, would be considered unutilized and accordingly would revert to the County." The panel understood that, were the Commission to approve Bill 933, neither project, both of which had been authorized by St. Michaels under its approved critical area program, could lawfully proceed. Moreover, the panel knew that Commission approval of Bill 933 would rescind the Commission's October 2003 approval of the change to St. Michaels' critical area program for the Strausburg growth allocation.

Finally, the panel reviewed growth allocation procedures in other critical area programs. They discussed the importance of the procedures being clearly set forth in a coordinated manner in the ordinances and programs of the counties and affected municipalities, and the impact of amending one local program in such a way that it creates conflicts with other approved programs.

At the close of discussion, the panel voted to recommend denial of Talbot County's proposed amendment, opining that accepting Bill 933 would (1) "negate at least one previous Commission action approving a local program change . . . the Strausburg growth allocation [in St. Michaels];" and (2) "create conflicts between the County program and several approved municipal programs . . . contrary to the Commission's oversight responsibility to ensure that local programs are implemented in a consistent and uniform manner."

At its regular meeting on May 5, 2004, the full Commission voted to deny Talbot County's proposed program amendment

as created by Bill 933.[9] The Commission also voted to ask the County to work with Commission staff to develop a growth allocation provision that would be compatible with the Critical Area Law. The minutes from the May 5, 2004 Commission meeting provide, in relevant part:

Dave Blazer moved on panel recommendation to deny approval of Talbot County Bill 933 as an amendment to the County's Critical Area Program and to invite the County to work with the Commission and its staff to develop new growth allocation provisions that will be compatible with the State Critical Area Act and Criteria. The basis for the motion is as follows: Accepting Bill # 933 would negate at least one previous Commission action approving a local program change. This is the refinement to the St. Michaels Program for the Strausburg growth allocation approved in October 2003. Accepting Bill # 933 would create conflicts between the County program and several approved municipal programs. The municipal programs have their own approved growth allocation procedures premised on the growth allocation reserves provided by the County. The conflict that Bill 933 would create is contrary to the Commission's oversight responsibility to ensure that local programs are implemented in a consistent and uniform manner. The motion was seconded by Bill Giese and carried unanimously.

On May 14, 2004, Commission staff formally advised Talbot County of the Commission's vote to deny the County's proposed amendment, but noted that "the Commission fully supported inviting Talbot County to work with the Commission and its staff to develop new growth allocation provisions that will be compatible with the State's Critical Area Act and Criteria."

### The Proceedings Below

The County declined the Commission's offer to collaborate on new growth allocation provisions and instead filed suit in

---

9. The Talbot County Attorney was present at both the panel meeting and the full Commission meeting.

the Circuit Court for Talbot County on June 11, 2004. The County's complaint requested a declaratory judgment, a writ of mandamus, and judicial review.

On July 8, 2004, the Commission filed a motion to dismiss. Thereafter, the County filed an amended complaint, and the Commission withdrew its motion to dismiss the County's mandamus count. The Towns of St. Michaels and Oxford moved to intervene on September 24, and November 1, 2004, respectively. A hearing on the Towns' motions to intervene and the Commission's motion to dismiss was held on November 17, 2004. The court granted the Towns' motions to intervene on December 1, 2004. By order dated December 8, 2004, the Court denied the Commission's motion to dismiss the declaratory judgment count, but granted the motion with respect to the judicial review count. Thus, the counts remaining before the court were for declaratory judgment and mandamus.

On February 18, 2005, the County filed its second amended complaint, adding relevant facts and restating its causes of action. On October 19, 2005, Miles Point Property, LLC and the Midland Companies, Inc. filed a motion to intervene, which was granted by the circuit court on December 8, 2005.

All parties filed motions for summary judgment and oppositions thereto. A motions hearing was held on January 26, 2006. In an opinion and judgment dated March 23, 2006, the circuit court denied the County's requests for relief. The County filed a timely notice of appeal and the Towns of Oxford and St. Michaels filed timely cross-appeals. Oxford moved to dismiss the County's appeal because the circuit court's judgment was not final, in that it failed to address the rights of the intervenors. On July 11, 2006, this Court dismissed the appeal.

On remand to the circuit court, the court issued a "Supplemental Memorandum" and "Final Judgment," dated August 14, 2006. Talbot County again filed a timely notice of appeal

on September 5, 2006. The Town of Oxford filed a timely notice of cross-appeal on September 11, 2006.[10]

## STANDARD of REVIEW

Our review of a circuit court's grant of summary judgment is *de novo. Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 440, 914 A.2d 113 (2007). "We determine whether the circuit court properly concluded that there was no dispute of material fact, and, if so, whether the circuit court's decision that the moving party was entitled to summary judgment was legally correct." *Cruickshank–Wallace v. County Banking & Trust Co.,* 165 Md.App. 300, 310, 885 A.2d 403 (2005), *cert. denied,* 391 Md. 114, 892 A.2d 477 (2006); *see* Md. Rule 2–501(f). "On appeal from an order entering summary judgment, we review only the legal grounds relied upon by the trial court in granting summary judgment." *Cochran v. Norkunas,* 398 Md. 1, 12, 919 A.2d 700 (2007).

All of the parties moved for summary judgment, each asserting a lack of dispute of material fact. In the absence of a material dispute of fact, we must determine whether the circuit court's ruling was legally correct.

 The Commission acts in a "quasi-legislative" capacity when it reviews local critical area programs and program amendments. *North, supra,* 106 Md.App. at 103, 664 A.2d 34. " '[W]here an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries.' " *County Council of Prince George's County v. Offen,* 334 Md. 499, 507, 639 A.2d 1070 (1994)(quoting *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 221–24, 334 A.2d 514 (1975)). It is within this narrow framework that we review the County's issues.

---

**10.** The Commission, the Town of Oxford, Miles Point Property LLC, and the Midland Companies, Inc. all filed appellees' briefs advocating their respective positions before this Court. The Town of St. Michaels did not participate in the present appeal.

### 1. Whether the Commission acted within the time prescribed by statute for accepting and processing Bill 933.

The County argues that "Bill 933 was approved by operation of law because the Commission failed to comply with mandatory statutory requirements." Specifically, the County contends that, because the Commission failed to act within the 90–day review period set forth in NR § 8–1809(o)(1),[11] Bill 933 was "deemed approved." We disagree.

The circuit court addressed the County's argument in its memorandum opinion:

NR § [8–]1809(o)(1) directs that, upon submission of a proposed amendment "the Commission shall act on the proposed program amendment within 90 days of the Commission's acceptance of the proposal. If action by the Commission is not taken within 90 days, the proposed program amendment is deemed approved." We regard [the County's] contention that [the Commission] did not comply with those requirements as an unmitigated carper.

The date for approval does not run from the date of submission, but the date of its acceptance by [the Commission]. NR § 8–1809(m) provides that "Within 10 working days of receiving a proposal under this paragraph, the Commission shall: (i) Mail a notification to the local jurisdiction that the proposal has been accepted for processing; or (ii) Return the proposal as incomplete." It is undisputed that the County's original submission was found to be incomplete, which resulted in extensive exchanges, telephonic and otherwise, between staff personnel of [the Commis-

---

11. NR § 8–1809(o)(1) provides:

For proposed program amendments, a Commission panel shall hold a public hearing in the local jurisdiction, and the Commission shall act on the proposed program amendment within 90 days of the Commission's acceptance of the proposal. If action by the Commission is not taken within 90 days, the proposed program amendment is deemed approved.

sion] and the County. Ultimately, all parties recognized that sufficient information had been provided and the matter moved forward.

It is not clear to us when, or if, [the Commission] ever mailed "notification to the local jurisdiction that the proposal has been accepted for processing." Even now, the County does not claim that it was unaware that the proposal had been accepted for processing or that it actively participated in various hearings and other proceedings on that basis. In view of the extensive contact between the parties, receipt of a formal mailed notice was a nicety whose absence did not affect to any degree the ability of the County or anyone else to participate in proceedings relative to the requested approval. Unlike the provision establishing the time for processing, the critical area statute provides no penalty for failure to provide notice of acceptance. Under the circumstances here, we decline to mandate one.

Turning now to the contention of alleged automatic approval under the second provision of the statute. The County concedes that it made no objection with respect to expiration of 90 days until the time when this action was filed. It sent no letter or communication indicating that the 90 days had been tolled, even at the time when the Commission's decision was announced. It is presented to us as a rather wan coda to arguments vigorously pressed in other respects.

Without dispute, [the Commission] took final action on May 5, 2004, which would mean that acceptance of the proposal could have occurred no earlier than February 5, 2004. We carefully listened to the various chronicles of events advanced by all parties during the hearing of this action and, quite frankly, find precious little difference of opinion. *[The County] had the burden of proving that action was not taken within 90 days of acceptance. We have no hesitation in finding as matters of fact that [the County] has not met that burden and that, in any event, the*

*most credible proof is that acceptance of the program occurred within 90 days prior to May 5, 2004.*

(Emphasis added).

 The County bases its conclusion that "[t]he 90 day period . . . expired on Tuesday May 4, 2004[,]" on the Commission's acknowledgment that *the earliest* that it could have received the County's re-submission letter was January 21, 2004. The County, however, has produced no evidence as to when the Commission actually received the letter. Indeed, the County concedes that the Commission's date stamp on the letter "is not legible." It was the County's burden to show that the Commission received the ordinance on an earlier date that would have put the date of the Commission's May 5, 2004 denial beyond the 90 days mandated by NR § 8–1809(*o*)(1). Because the County has not satisfied its burden, we agree with the circuit court that the Commission accepted and processed Bill 933 within the time prescribed by the statute. "[I]n the absence of evidence to the contrary, administrative officers will be presumed to have properly performed their duties and to have acted regularly and in a lawful manner." *Maryland Sec. Comm'r v. U.S. Sec. Corp.*, 122 Md.App. 574, 588, 716 A.2d 290 (1998).

**2. *Whether the Commission's refusal to approve Bill 933 was beyond its legal authority and/or otherwise arbitrary and illegal.***

 The County argues that, in refusing to approve Bill 933, the Commission exceeded its statutory authority and "acted arbitrarily, capriciously and illegally." We are not persuaded.

The propriety of the Commission's decision to deny approval of Bill 933 was extensively addressed by the circuit court:

### Interference with existing projects

The first of [the Commission's] reasons for disapproval was that "Accepting Bill 933 would negate at least one previous Commission action approving a local program

change. This is the refinement to the St. Michaels program for the Strausburg growth allocation approved in October 2003."

The factual background was explained in the [Commission] staff report, which stated that "the Strausburg Subdivision . . . involved 21.00 acres of growth allocation to change the Critical Area designation from Resource Conservation Area (RCA) to Limited Development Area (LDA) for a ten lot residential subdivision. The Commission approved this growth allocation request as a refinement to St. Michaels' Critical Area Program on October 1, 2003." At the hearing in this Court, we were further advised that commencement of the Strausburg Subdivision had been delayed for a substantial period of time pursuant to a Development Rights and Responsibilities Agreement entered into between St. Michaels and the developer.[12]

The concern of [the Commission] lay in an uncodified provision in Bill 933, containing a section entirely separate from amendments to the local critical area program and headed "Effective Date and Severability; legislative intent". . . . It provides that "Growth allocation awarded by any town that remains unutilized on the effective date of this ordinance shall revert to the County." The Strausburg Subdivision lay squarely within the sights of this automatic reverter. [The Commission] put it well: "Bill 933 would negate at least one previous Commission action approving a local program change." And, by use of the words "at least" it evidenced similar concern about projects . . . which had

---

12. The staff report also referred to (a) "the Miles Point III application, which the Town approved for 70.92 acres of growth allocation in January 2004," which had been submitted to [the Commission] and was then being considered by it and (b) "the Cooke's Hope Project in Easton" for which the Town of Easton had used a combination of the original "reserved" growth allocation acreage and some supplemental growth allocation that it received from the County under the process of Bill 762 created the "supplemental" growth allocation process. That had been reviewed through the County's supplemental growth allocation process and sent to [the Commission] for approval, but had not yet been acted upon.

already received Town and/or County approval and were awaiting [Commission] review.

Our first observation is in the form of a question as to whether the quoted provision, not being subject to codification or otherwise proposed to be incorporated into the County's critical area program, constituted an amendment of that program. If not, of course, it was for all intents and purposes non-existent from the standpoint of the critical area program and under the critical area statute could have no collateral effect upon that program. As the parties seem to have regarded it as part of a program amendment, we shall do likewise.

In essence, what [the Commission] was asked to do by the County was to indirectly ratify a nullification of its own approval of the Strausburg Subdivision. That approval had not been given to action by the County, but to action of the Town of St. Michaels. The approval was wholly valid under the critical area statute, the Town's critical area program and existing provisions of the *Talbot County Zoning Ordinance*. We believe it perfectly obvious that the County has no right to require [the Commission] to approve a measure which has the effect of revoking prior action by [the] Commission.

For that and reasons hereafter cited with respect to [the Commission's] second reason for disapproval, we conclude that relevant law and facts impel, as much as support, [the Commission's] disapproval.

### Creation of conflicts among critical area programs

[The Commission] gave this additional reason for its disapproval:

Accepting Bill 933 would create conflicts between the County program and several approved municipal program[s]. The municipal programs have their own approved growth allocation procedures premised on the growth allocation reserves provided by the County. The conflict that Bill 933 would create is contrary to the

Commission's oversight responsibility to ensure that local programs are implemented in a consistent and uniform manner.

It is a tribute to this accurate and concise statement that even the prolixity of the present author can ultimately add so little to it.

From a factual standpoint, this statement defies refutation. It is bad enough that the municipalities were left with critical area programs which contained functionally inoperative provisions and therefore with nothing which represented a comprehensible growth allocation program, if indeed such existed at all. This is wholly untenable in view of the fact that both the County and the municipalities within it had adopted separate critical area programs on the basis of the 1989 growth allotments. [The Commission] had given its approval to those programs on the same basis.

At least partial recognition of this is to be found in paragraph [19] of the County's Preamble to Bill 933, where it is said that "growth in and around the towns affects not only the particular town, but also the County as a whole." Had it also acknowledged the converse—that growth in and around unincorporated parts of the County affect not only the County but also the towns—it would have realized that [the Commission] approved the several critical area programs on the basis of just such a comprehensive perspective.

As [the Commission] correctly recognized, in a very real sense the individual programs were components of an overall critical area program applicable to all critical areas in Talbot County. Who or what is to say that any of those constituent programs would have passed muster if it was not consistent with that overall plan? More directly, how can it be said that the unilateral changes to one of the component parts of only one of those individual programs will create a comprehensive program for the critical area in Talbot County—even for the County itself?

First and foremost, under NR § 8–1806, [the Commission] "has all powers necessary for carrying out the pur-

poses of this subtitle." One is the seminal statement in NR § 8–1801 of "the purpose ... [t]o implement the Resource Protection Program on a *cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight.* [emphasis supplied]." Although not specifically cited, the above-quoted decision of [the Commission] recognized and applied that power and the duty which it implied.

In addition, [the Commission] has specific powers with respect to proposed amendments to a local critical area program. As clearly stated in NR § 8–1809(j): "The Commission shall approve programs and program amendments that meet: (1) The standards set forth in § 8–1808(b)(1) through (3) of this subtitle; and (2) The criteria adopted by the Commission under § 8–1808 of this subtitle."

"State criteria" so required to be reflected in a local critical area program include:

- [Commission] regulation 27.01.10.01: "In developing their Critical Area Programs, local jurisdictions shall use the following general program criteria ... [one being that] Local permitting and approval processes shall be *coordinated* so that *cumulative impacts of regulated activities* can be readily assessed [emphasis supplied]."

- Paragraph G of the same regulation: "The local program document shall include a statement of the local agencies involved, their responsibilities and their *coordination* with each other and appropriate State, federal, or private organizations [emphasis supplied]."

- [Commission] regulation 27.01.02.06, specific to growth allocation, directs that "When planning future expansion of intensely developed and limited development areas, counties, *in coordination with affected municipalities,* shall establish a process to accommodate the growth needs of the municipalities [emphasis supplied]."

We concur with the conclusion of [the Commission] that disapproval of Bill 933 was necessary "to ensure that local programs are implemented in a consistent and uniform

manner." That is the specific purpose announced in NR 8–1801 and was therefore the marching order of [the Commission].

The court further acknowledged the County's unwillingness to cooperate with the Towns in preparing and adopting Bill 933:

### The County's incorrect premises

We perceive a flaw in the County's basic premise, which is not specifically stated but is more than implicit in the action of [the Commission].

That flaw lies in the notion advanced in Preamble [21] of Bill 933 ... that "the original intent of the State law governing growth allocation ... gave the County the authority to determine, within the limits imposed by State law and regulations, how that growth allocation would be utilized, and reallocated among the Towns and the County, project by project." The assertion is repeated in Preamble [19].

An important factor which the County states in those Preambles, but cannot be found in its conduct, is the existence of "limits imposed by State law and regulation." It alleges that it has power "to determine ... how that growth allocation would be utilized, and reallocated among the Towns and the County," but gives no attention to "the limits imposed by State law and regulations" from which such power must be derived.

The stated purpose of critical area legislation involves the establishment and implementation of critical area programs "in a consistent and uniform manner." NR § 8–1801. The common thread of the [State] criteria discussed ... *supra,* is that this purpose be carried out by means of "coordination." That word, whether used as a noun, verb or adjective, has no subtle meaning. "To 'coordinate' means to harmonize, work together, or bring into a common action, effort or condition." *Network Commerce, Inc. v. Microsoft Corp.,* 260 F.Supp.2d 1034, 1041 (W.D.Wash., 2003), *affirmed* 422 F.3d 1353. "The term 'coordinate,' according to the American Heritage dictionary means 'of equal rank,

authority, or importance with another.' Webster's Third New International Dictionary 502 (2002)." *Sharp v. Fields (In re Baby W.)*, 796 N.E.2d 364, 373 (Ind.App., 2003).

As the last quotation states, "coordination" involves equality in its true sense. The concept of equality is also recognized in *Empire Ins. Co. v. Cooper*, 138 S.W.2d 159, 164 (Tex.Civ.App., 1940): " 'Co-ordinate' means equal, of the same order, rank, degree or importance; not subordinate. Webster's New International Dictionary." Plainly, in the context of critical area law, "The ordinary meaning of the word 'coordinate' does not connote a dominating influence." *Network Commerce, Inc. v. Microsoft Corp., supra.*

Another court has shared our incredulity at the proposition that unilateral action constitutes coordination: "We know of no way to define the verb 'coordinate' that would allow the Defendants to argue with a straight face that any of them coordinated the releases with Powers. Giving all due weight to the inescapable vagueness of words, it seems to this Court an abuse of language to suggest that a person has 'coordinated' a matter with another when she has not contacted him or, at the very least, an associate who is working on the same case." *Johnson v. Sawyer*, 760 F.Supp. 1216, 1229 (S.D.Tex., 1991), *aff'd in part, modified in part and remanded in part* 980 F.2d 1490 (5th Cir.Tex., 1992).

While allowing of other interpretations, the [Commission] staff report fully concurs with the views here expressed:

> The Panel has discussed the meaning of the COMAR provisions relating to "coordination" between counties and affected municipalities. The Panel has acknowledged the various potential interpretations of this term. The Panel believed that the definition in Webster's Dictionary, "to harmonize in a common effort," seems to be a comprehensive and reasonable definition. The Panel seemed to agree that at a minimum "coordination" involves the participation of the affected parties.

We particularly emphasize the words of *Empire Ins. Co. v. Cooper and Network Commerce, Inc. v. Microsoft Corp.,*

both *supra*, that " 'Co-ordinate' means equal, of the same order, rank, degree or importance; not subordinate" and that "The ordinary meaning of the word 'coordinate' does not connote a 'dominating influence.' " While we have noted that various jurisdictions have implemented the "coordination" requirement in various ways ... this does not suggest to any degree that the County is the sole owner and dispenser of growth allocation largesse.

The County sees its position as being even above *primus inter pares*. It is virtually admitted that it allowed the defendant Towns no participation in the preparation and adoption of Bill 933, other than the right to participate in a public hearing afforded all citizens—a time when the die was already cast. However they may be characterized, that and the conduct reflected in the letter of the president of the Town Council of Easton reflect little, if any, coordination and absolutely no cooperation.

A similar variety of hubris lies in the County's conception of its place in the critical area pantheon. At the beginning of the complaint now under consideration ... the County seeks a declaration that "Bill 93 3 ... *has been validly enacted as a local program amendment* to Talbot County's Critical Area Program [emphasis supplied]." The fact of the matter is that Bill 933 enacted no amendment at all.

NR § 8–1809(h) clearly provides that the action of the county is a mere proposal for amendment. By subsection (i), actual amendment does not occur until a proposal is approved by the Critical Area Commission. The proposal is not incorporated in the local critical area program (*i.e.,* the program is not amended) until [the final] Critical Area Commission approval.

Once again, the [Commission] decision was as much impelled as it is supported by the law and facts which relate to Bill 933.

(Selected footnotes omitted).

Our review of the entire record, and of the circuit court's recapitulation of the evidence, leads us to conclude, as did the

**504**

circuit court, that the Commission acted "within its legal boundaries" in declining to approve Bill 933. We find no error in the court's legal rulings or findings of fact.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**