18 A.3d 16

**Jerry SMITH, et al.**

v.

**COUNTY COMMISSIONERS OF KENT COUNTY, Maryland, et al.**

**No. 2, Sept. Term, 2010.**

Court of Appeals of Maryland.

April 25, 2011.

G. Macy Nelson (David S. Lynch of Law Office of G. Macy Nelson, Towson, MD), on brief, for petitioners.

C. Daniel Saunders (Cristina Harding Landskroener, Chestertown, MD; Thomas N. Yeager, Chestertown, MD), on brief, for respondents.

Douglas F. Gansler, Atty. Gen. of Maryland, Marianne E. Dise, Asst. Atty. Gen., Department of Natural Resources, Annapolis, MD, for Amicus Curiae brief of Critical Area Commission for the Chesapeake and Atlantic Coastal Bays.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

For a case posing but one question, a number of interesting additional questions are imbedded here, most of which we shall not decide today. We must decide whether and, if so,

when persons, assumedly aggrieved by the Board of County Commissioners of Kent County's [1] approval of a growth allocation request to amend the County's local Critical Area Plan under the regulatory scheme of the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program, Maryland Code (1990, 2007 Repl.Vol.), Natural Resources Article §§ 8–1801 *et seq.*, may seek judicial review of that approval. Jerry Smith and a number of other Kent County residents (collectively, "Petitioners") question here the Court of Special Appeals's dismissal of their appeal from the judgment of the Circuit Court for Kent County, which affirmed the County's approval of a growth allocation application by Drayton Manor, LLC (the Developer), to allow increased development of its property.

The problem in this case arises from a proclamation that states that the County's decision is not effective until approved by the State Critical Area Commission (the Commission). Apparently while consideration of the local growth allocation approval by the County was pending before the Commission, Petitioners sought judicial review in the Circuit Court of the County's decision. The Circuit Court affirmed the County's approval, and Petitioners thereafter filed an appeal to the Court of Special Appeals. After requesting specific briefing on the finality of the County's approval vis á vis the ability to maintain a judicial review action, the intermediate appellate court, by order, dismissed the appeal as premature.

Before us, Petitioners argue generally that:

The [County's] approval of the Developer's application for growth allocation was a final, appealable order because it terminated the case before the [County]. Furthermore, the [Commission]'s subsequent review of the growth allocation does not affect the appealability of the [County's] decision because the [Commission] and the County conduct separate

---

1. We shall use the reference "the County" throughout this opinion. It will mean, depending on the context, either the Board of County Commissioners or the political subdivision that is Kent County.

reviews, apply different standards and develop different records.

In response, the County maintains that the intermediate appellate court's dismissal of Petitioners' appeal was correct, considering "[t]hat decision [*i.e.*, the County's approval] was not a final, appealable act because the proposed program amendment was required by law to be reviewed and approved by the Critical Area Commission before it could have any legal effect." The Commission filed an amicus brief generally supporting Petitioners' position regarding their ability to seek judicial review of the County approval.

We hold that the County's approval of Drayton Manor's growth allocation request was not a final action, considering that the Commission's required decision may modify, reject, delay, or even preclude the local approval from becoming effective. As a non-final order, even assuming that a right to seek judicial review existed (a premise with which we do not agree, for reasons to be explained), no immediate right existed to have judicial review take place. Accordingly, although the Court of Special Appeals's dismissal of Petitioner's appeal to that court was in the right church, it was in the wrong pew. It should have gone further and, as explained more fully *infra*, endorsed dismissal by the Circuit Court of the litigation.

## STATUTORY BACKGROUND, FACTS, AND LEGAL PROCEEDINGS

### A. *Chesapeake and Atlantic Coastal Bays Critical Area Protection Program*

The General Assembly established the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program ("Critical Area Program" or Program), Md.Code (1990, 2007 Repl.Vol.), Natural Resources Article §§ 8–1801 *et seq.*, in 1984, in recognition of the Chesapeake Bay's importance and the State's and local governments' role in its future health, and in response to then-growing concerns over the deteriorating condition of what the Legislature deemed "natural re-

sources of great significance to the State and the nation . . . ." Nat. Res. Art. § 8–1801(a)(1).[2]

The Critical Area Program "require[s] all local jurisdictions, under the direction of [the] Chesapeake Bay Critical Area Commission, to formulate and implement a plan to control development in the 'critical' or protected area." *Critical Area Comm'n for the Chesapeake and Atl. Coastal Bays v. Moreland, LLC*, 418 Md. 111, 117, 12 A.3d 1223, 1226 (2011). The Critical Area Program's primary mechanism for protecting the Bay is limiting development in statutorily defined "critical areas," Nat. Res. Art. § 8–1807, where unchecked human growth could cause harm to the Bay. The Program establishes a development-free "buffer of at least 100 feet landward from the mean high water line of tidal waters, tributary streams, and tidal wetlands . . . ." Nat. Res. Art. § 8–1801(a)(4). The Program requires local governments to zone all critical areas as one of three tiers: (1) Resource Conservation Area ("RCA"), *see* COMAR § 27.01.02.05; (2) Limited Development Area ("LDA"), *see* COMAR § 27.01.02.04; or (3) Intensely Developed Area ("IDA"), *see* COMAR § 27.01.02.03. The amount of growth in IDAs and LDAs allowed in each jurisdiction's "critical area" is known as the county's "growth allocation." *See* Nat. Res. Art. 8–1802(a)(11) (" 'Growth allocation' means the number of acres of land in the Chesapeake Bay Critical Area that a local jurisdiction may use to create new intensely developed areas and new limited development areas."). Each county's growth allocation is capped at five percent of its RCA. Nat. Res. Art. § 8–1808.1(b). In each

---

**2.** Chief Judge Bell, writing for the Court in *Foley v. K. Hovnanian at Kent Island, LLC*, 410 Md. 128, 132, 978 A.2d 222, 224 (2009), described the circumstances surrounding the establishment of the Critical Area Program:

> The Chesapeake Bay is nothing short of magnificent. For decades, fishermen found plentiful supplies of blue crabs, clams and oysters in its waters. Over time, however, the results of increased human activity on, in and near the Bay saw its deterioration and the decrease in the fruits it bore. In 1984, the Maryland General Assembly responded in part. It enacted the [Critical Area Program] to counteract the increasing levels of deterioration that human activity near the Chesapeake Bay's waters and habitats was causing.

jurisdiction, these Critical Area Zones overlay the pre-existing zoning; that is, local zoning ordinances must comply with the Program, but may add additional zoning conditions or restrictions. *See Bucktail, LLC v. County Council of Talbot County,* 352 Md. 530, 535, 723 A.2d 440, 442 (1999); *see also Md. Overpak Corp. v. Mayor of Baltimore,* 395 Md. 16, 26 n. 10, 909 A.2d 235, 241 n. 10 (2006).

The Program is complicated by the division of responsibilities in its implementation between the State and local governments. *See* Nat. Res. Art. § 8–1801(b)(2) (stating that implementation of the Program is to be done "on a cooperative basis between the State and affected local governments"). While "each local jurisdiction ... ha[s] primary responsibility for developing and implementing a [local] program," such responsibility is "subject to review and approval by the Commission." Nat. Res. Art. § 8–1808(a); *see* Nat. Res. Art. § 8–1808.1(c)(2) (stating that the Commission shall ensure that the local plan is "consistent with the purposes, policies, goals, and provisions of th[e Critical Area Program]").

After the adoption by a local government of its initial plan, all changes to the local plan, including growth allocation amendment requests, are subjected to a two-tiered approval process, similar to the process for the initial plan adoption. The local government, in considering growth allocation amendment requests, is governed by guidelines set forth in Nat. Res. Art. § 8–1808.1(c)(1).[3] If the local government rejects a

---

**3.** These guidelines include:

(i) Locat[ing] a new intensely developed area in a limited development area or adjacent to an existing intensely developed area;

(ii) Locat[ing] a new limited development area adjacent to an existing limited development area or an intensely developed area;

(iii) Locat[ing] a new limited development area or an intensely developed area in a manner that minimizes the impact to a habitat protection area as defined in COMAR 27.01.09, and in an area and manner that optimizes benefits to water quality.

(iv) Locat[ing] a new intensely developed area or a limited development area in a resource conservation area at least 300 feet beyond the landward edge of tidal wetlands or tidal waters; [and]

growth allocation request, the application is terminated and the Commission plays no role because there is nothing for it to review. If, however, the local government approves a growth allocation request (with or without restrictions/conditions), the Commission must "ensure that the guidelines ... have been applied in a manner that is consistent with the purposes, policies, goals, and provisions of [the Program]." Nat. Res. Art. § 8–1808.1(c)(2). On review, the Commission may approve the request, deny the request, approve the request subject to conditions, or return the request to the local government with a list of changes to be made. *See* Nat. Res. Art. § 8–1809(*o* )(3).

B. *Kent County's Critical Area Plan*

Kent County's initial Critical Area plan "was approved by the Critical Area Commission on January 20, 1988 and became effective on April 12" of that year. *Wharf at Handy's Point, Inc. v. Dep't of Nat. Res.*, 92 Md.App. 659, 663, 610 A.2d 314, 316 (1992). The Kent County Critical Area Plan is incorporated into Kent County's Land Ordinance, where the balance of Kent County's zoning and planning provisions reside. *See* Kent County Land Use Ordinance, http://www.kentcounty. com/gov/planzone/newzone/Part1_A10.pdf (last visited 7 February 2011). As such, the local plan is a part of a public local law.

Growth allocation amendment requests in Kent County purportedly also are governed by the Kent County Growth Allocation Policy ("the Policy"), adopted initially by the County on 9 March 1999. More will be said about the circumstances of the adoption of the Policy later. The Policy reiterates that the County Board of Commissioners has the authority to grant growth allocation requests in the "incorporate[d] towns" and the "unincorporated territory" of Kent

(v) Except as provided for in item (vii) of this paragraph, no more than one-half of the expansion allocated in the criteria of the Commission may be located in resource conservation areas

. . . .

County. For growth allocation requests in the unincorporated territory to be approved, the Policy provides that an applicant must meet the following conditions:

1. The proposed project is identified in the Kent County Comprehensive Plan as a means to expand and provide more diversity in the size, number, and type of businesses in Kent County or as a means to enhance and expand locally based tourism that relies upon the unique natural, cultural, and historic features and qualities of Kent County.

2. Proposed projects are suitable for the sensitive location and pose minimal risks to the environment.

3. The project is compatible with the surrounding community and land use.

4. Site location and development will use innovative design features to minimize negative impacts on water quality, habitat protection areas, woodlands, and forests. Examples include but are not limited to the use of buffer areas to protect habitat, wildlife corridors, and other important natural areas, the use of conservation landscapes or bayscapes, and limitation of impervious surfaces through clustering and shared roadways.

5. The proposed project is consistent with the goals and intent of the Kent County Comprehensive Plan, Zoning Ordinance, Subdivision Ordinance, and Critical Area Program.

6. The proposed project must accomplish two of the following standards to mitigate the negative effects caused by higher intensity development than normally allowed:

   a. The project is within a developed area such as a village.

   b. The project has direct access to public sewer and water.

   c. Man-made structures on the site are clustered.

   d. Efforts are made to enhance the habitat of threatened or endangered species or species in need of protections beyond the minimum required standards.

e.  Permanent environmental easements are donated.

f.  All agricultural lands on the site are placed into a protective easement.

g.  Public access to natural and physical amenities is provided.

h.  The development uses infill or existing structures.

i.  Habitat for forest interior dwelling birds and/or other sensitive species is created or expanded.

j.  The restoration, enhancement or creation of wetlands are included in the project.

k.  Afforestation/reforestation is provided beyond the minimum required standards.

l.  Historic structures are restored.

m.  Buildings are designed to reflect the heritage of Kent County.

Significantly, the Policy, as originally adopted, purports to provide for an aggrieved person a right to seek judicial review of the County's decision on a growth allocation amendment. The Policy states that "[a]ny aggrieved person with standing may within thirty (30) days after the decision,[4] appeal [5] to the Circuit Court of Maryland." [6]  Finally, the Policy provides that "[a]pplications for growth allocation shall not be effective until approve[d by the Commission] under Natural Resources Article 8–1809 . . . ."

---

4.  Although, "the decision" seems to refer to the County's action on "any growth allocation amendment," as discussed *infra*, that is not the only reasonable construction of this language.

5.  An "appeal," in this context, is understood to be an archaic reference to what is now known as a petition for judicial review proceeding.  *See* Arnold Rochvarg, *Maryland Administrative Law* § 4.1, at 102 (2d ed. 2007) ("Despite the fact that judicial review of an administrative decision is not an exercise of appellate jurisdiction, it has been common practice to refer to such judicial review in a circuit court as an 'appeal.' ").

6.  We understand the reference to the "Circuit Court of Maryland" to mean the Circuit Court for Kent County.

## C. *Drayton Manor's Growth Allocation Application*

Drayton Manor is a 32–acre tract, improved by a farmhouse, supporting buildings, and a small retreat center, in Kent County. The property is located on Still Pond, which drains into the Chesapeake Bay. Since 1965, the retreat center use of Drayton Manor had a maximum capacity of twenty beds, and had been used for small, religious retreats. In 2003, however, the owners sought to develop the property into a "Retreat Center, Spa & Conference Center" which would intensify meaningfully the property's use.

Because the proposed use of the tract, classified as RCA, exceeded the County's Critical Area Program's development restrictions for the property, the Developer sought a growth allocation to reclassify the property to IDA. The County held a hearing on the request on 23 January 2007. The request was granted, subject to thirty-four explicit restrictions/conditions, on 27 March 2007. Thereafter, on 23 April 2007, Petitioners filed the present judicial review action in the Circuit Court for Kent County. The Circuit Court, in a 4 March 2008 memorandum opinion, considered the list of Petitioners' claims and affirmed the County's decision to approve conditionally the Developer's growth allocation request.[7]

---

7. Petitioners posed the following questions:

[Whether the Developer's] [p]roposed use as a "Retreat Center, Spa & Conference Center" complies with the requirements in Md. Ann. Code Natural Resources § 8–1808.1(c)(1)(iii) that Kent County "[l]ocate ... an intensely developed area in ... an area and manner that optimizes benefits to water quality" and in the Kent County Growth Allocation Policy that a Proposed use "use innovative design features to minimize negative impacts on water quality."

\* \* \*

[Whether] the [County] improperly failed to find that the record before it lacked substantial evidence to demonstrate [compliance]

Petitioners appealed timely to the Court of Special Appeals. On 30 September 2009, the intermediate appellate court dismissed Petitioners' appeal on the ground that it was premature to seek judicial review of the County's action, explaining:

The Kent County Commissioner's decision was subject to approval by the Critical Area Commission and was not "effective" at the time it was issued. Under applicable law governing the Chesapeake and Atlantic Bays Critical Area Program, the Commissioners' grant of the growth allocation was not final because it was not "effective" at the time it was granted. . . .

Petitioners filed timely a Petition for Writ of Certiorari with this Court on 5 November 2009. Before we could act on the Petition, however, on 1 December 2009, the County amended the Policy to "clarify the time period in which an aggrieved person may appeal a decision of the County Commissioners

---

with statutory requirements for water quality found in Md. Ann.Code § 8–1801.1(c)(1).

&ast; &ast; &ast;

[Whether] the [County] failed to provide adequate explanation concerning the Project's compliance with the Kent County Land Use Ordinance. . . .

&ast; &ast; &ast;

[Whether] the [County] improperly failed to find that the record before it lacked substantial evidence to fulfill the goals and intent of the Comprehensive Plan and requirements of the Zoning Ordinance.

&ast; &ast; &ast;

[Whether] the [County] failed to explain sufficiently how the Proposed use would be in harmony with the surround[ing] land and community.

&ast; &ast; &ast;

[Whether] the [County] erred in finding the record contained substantial evidence that the Proposed use would be in harmony with the surrounding community and land use with regard to the overnight guest rooms that will be constructed.

&ast; &ast; &ast;

[Whether] the [County] erred in determining Respondent's application complied with the guidelines growth allocation in Md. Ann.Code Natural Resources § 8–180.1(c)(1) . . . [which requires] the [County] first to determine whether they can locate a new IDA inside an existing LDA or adjacent to an existing IDA.

regarding a Growth Allocation application." The amended Policy reads:

> Any aggrieved person with standing may, within thirty (30) days after the decision, file a petition for judicial review of the decision with the Circuit Court for Kent County, Maryland pursuant to Rules 7–201 et seq. of the Maryland Rules of Procedure. If the decision in which judicial review is sought is the granting of Growth Allocation, the decision shall not be considered final until approved by the Critical Area[ ] Commission . . . is obtained, and the petition shall be filed within thirty (30) days of such approval.

> \* \* \*

> Applications for growth allocation shall not be effective until approved by the Critical Area Commission for the Chesapeake and Atlantic Coastal Bays pursuant to Article 8–1809 of the Natural Resources Article of the Annotated Code of Maryland, as the same may be amended from time to time.[8]

On 18 December 2009, we granted Petitioners' Petition for Writ of Certiorari, *Smith v. Kent County*, 411 Md. 740, 985 A.2d 538 (2009), to consider the sole question posed: whether "the decision of the County Commissioners of Kent County, Maryland[,] to approve an application for growth allocation [is] a final, appealable decision despite the fact that it was conditioned upon an approval by the Critical Area Commission." In reliance on the 1 December 2009 amendment of the "appeal" provisions of the Policy, the County moved this Court on 30 December 2009 to dismiss the case as moot. According to the County, the question for which we issued our writ of certiorari became moot when the County made "clear" in the 1 December 2009 amendment to the Policy that judicial review was not authorized until the Commission acted. Petitioners, in a response filed on 11 January 2010, opposed dismissal, arguing that the County should not be allowed to change the "law" (*i.e.*, the Policy) "to defeat a citizen's challenge to that

---

8. The court was not informed of the existence of the amendment of the Policy until 30 December 2009, as will be explained shortly.

government's action." Moreover, if the action was dismissed, Petitioners declaimed that "the [c]itizens will be precluded from challenging the County's decision to grant the growth allocation because the Critical Area Commission does not consider the same criteria as the County." We deferred action on the motion to dismiss until oral argument.

Notwithstanding this timeline with respect to the judicial review action of the County action, a parallel dimension evolved with respect to the Commission's consideration of the County's approval of the growth allocation. As noted *supra,* apparently while consideration of the local growth allocation approval by the County was pending before the Commission, Petitioners filed their judicial review action in the Circuit Court from the County's decision.[9] On 27 April 2007, the Commission requested additional information from the County. On 1 August 2007, it requested certain changes be made to the Developer's growth allocation application. A panel of the Commission ("the Panel") held a hearing on 30 May 2008, *see* Nat. Res. Art. § 8–1809(*o* )(1),[10] to consider whether Drayton Manor's request was consistent with the Critical Area Program. At that time, the Panel requested Commission staff to research additional information on a number of topics attendant to the Drayton Manor request.[11] On 4 June 2008,

---

**9.** It is not clear on this record the date on which the County transmitted its approval to the Commission for the latter's action. We know that this transmittal happened sometime before 27 April 2007, the date on which the Commission wrote to the Kent County Department of Planning and Zoning acknowledging the transmittal and requesting a "draft of the Critical Area Map reflecting the Drayton Manor property's new classification as an [IDA] . . . ." It appears that the County complied with the request, after which the Commission conducted a hearing on 9 July 2007 and requested additional information. The County supplied this information by letter and supporting memorandum of 13 July 2007.

**10.** Natural Resources Article § 8–1809(*o* )(1) provides, in pertinent part: "For proposed program amendments, a Commission panel shall hold a public hearing in the local jurisdiction, and the Commission shall act on the proposed program amendment within 90 days of the Commission's acceptance of the proposal."

**11.** These included: (1) the Maryland Department of the Environment's ("MDE") permit process for drip irrigation; (2) MDE's water appropri-

the Panel recommended to the full Commission that the growth allocation request be approved with various additional conditions.[12, 13]

---

ation for the site; (3) whether it was possible to vegetate a 300–foot setback while maintaining a view; (4) a schematic of storm water management; (5) verification of the proposed maximum occupancy at Drayton Manor; and (6) clarification from the County on County Policies regarding Priority Funding Areas, Certified Heritage Areas, and Stories of the Chesapeake Heritage Areas.

12. These conditions, which were different from or supplemental to the restrictions/conditions accompanying the County's approval, included:
  1. Prior to the start of construction, the County will submit to Commission staff a copy of the MDE permit for the proposed onsite drip irrigation system.
  2. Prior to the start of construction, the County will submit to Commission staff a copy of the MDE permit to allow an increase in the gallons per day of water pumped from the existing Drayton well.
  3. Prior to the start of construction, the County will submit to Commission staff copies of the approved stormwater management and sediment and erosion control permits.
  4. Prior to the issuance of any permits or final approvals by the County, a detailed Buffer Management Plan at an appropriate scale shall be prepared and submitted to the full Commission for review and approval. . . .
  5. The 300–foot setback shall be established in forest vegetation as the 100–foot buffer in order to provide appropriate riparian forest cover for wildlife that are currently using the site. . . .
Importantly, the Panel disagreed with at least one of the County's conditions for approval. The County provided in its approval that "[s]ignificant view corridors from the site and into the site will be preserved and enhanced as approved by the Kent County Planning Commission." Noting that the State Critical Area Commission was the final arbiter on "consisten[cy] with State Critical Area laws and regulations," the Panel determined that the County's condition "may not be consistent with the State Critical Area laws" and determined that the "Buffer Management Plan" in numbers 4 and 5 above, "as finally approved by the Critical Area Commission, may not include all or any of the view corridors requested by the County."

13. It is not clear from this record whether and when the full Commission took final action on the Panel's recommendation. The record does not reflect any action by the Commission after the Panel's "favorable" recommendation. Nonetheless, the Commission seems to treat the Panel's recommendation as its final decision. *See* Brief for Critical Area Commission for the Chesapeake and Atlantic Coastal Bays as Amicus Curiae Supporting Petitioners, at 4 ("The [Commission] approved the County's request, subject to several conditions, on June 4,

Petitioners filed, on or about 2 July 2008 in the Circuit Court for Anne Arundel County, a petition for judicial review of the presumed 4 June 2008 approval by the Commission of the County's local program growth allocation amendment for Drayton Manor.[14] That case was transferred to the Circuit Court for Kent County, possibly for venue reasons, and surfaced on the docket of that court on or about 16 October 2009.[15] The Commission moved in the Circuit Court to dismiss that petition on two grounds: (1) the underlying governmental proceedings and action were quasi-legislative in nature [16] and, therefore, not subject to scrutiny in a petition for judicial review proceeding; and (2) there is no provision in

2008."). There is, however, at least one other possible scenario: under Natural Resources Article § 8–1809(*o*)(1), the Commission's non-action within 130 days of its acceptance of a proposed program amendment results in approval by operation of law of the "proposed program amendment." This scenario carries with it, however, an ambiguity as to whether that which is deemed approved is the Panel recommendation, the County's approval action, or Drayton Manor's application as submitted to the County, each of which varies to some degree, one from the other.

14. Petitioners' Petition for Writ of Certiorari, filed on 5 November 2009, notes, the judicial review proceeding filed in Anne Arundel County was initiated "as a procedural safeguard 'to ensure that their Court of Special Appeals matter [regarding the County action was] not rendered moot by the final [Commission] approval of [the] growth allocation [presumed to have occurred on 4 June 2008].' "

15. While this procedural history is not part of the record here, we take judicial notice of it. *See Swinson v. Lords Landing Vill. Condo.*, 360 Md. 462, 467, 758 A.2d 1008, 1011 (2000) ("The actual record of the case, which was never placed into evidence but of which we may take judicial notice, shows that judgment was entered on the docket. . . ."); *Minger v. State*, 157 Md.App. 157, 164 n. 2, 849 A.2d 1058, 1062 n. 2 (2004).

16. *See, e.g., Talbot County v. Town of Oxford*, 177 Md.App. 480, 492–93, 936 A.2d 374, 381 (2007) (legal challenge to quasi-legislative act of State Critical Area Commission action on local Critical Area Program amendment, characterized as quasi-legislative in nature, proceeded as declaratory/mandamus action, while companion petition for judicial review was dismissed); *North v. Kent Island Ltd. P'ship*, 106 Md.App. 92, 664 A.2d 34 (1995) (action on growth allocation petition is not a "contested case" within the ambit of State Administrative Procedure Act).

Md.Code (2000, 2007 Repl.Vol.), Natural Resources Article §§ 8–1801—8–1817, authorizing specially judicial review of the Commission's action on a proposed local program amendment. Agreeing with the Commission's first ground, the Circuit Court, by order of 8 March 2010 and supporting memorandum opinion, dismissed the action. The Court of Special Appeals has no record of an appeal being taken by Petitioners from this dismissal.[17]

Considering the rather convoluted procedural posture of the parties' disputes, it may be beneficial to render the relevant events in a summary and comparative chronological order:

*COMPARATIVE TIMELINES*

| *Kent County Action* | *State Commission Action* |
|---|---|

17. Another question arises here, which we shall not resolve. Recognizing that "any right of appeal [or judicial review] . . . must find its source in an act of the legislature," *State v. Bailey*, 289 Md. 143, 147, 422 A.2d 1021, 1024 (1980), *superseded by statute on other grounds*, one may ask where is there, in the present case, a right of appeal to the Court of Special Appeals granted by State statute or public local law? *See* Md.Code (1974, 2006 Repl.Vol.), Cts. & Jud. Proc. Art., § 12–302 ("Unless a right to appeal is expressly granted by law, § 12–301 of this subtitle does not permit an appeal from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of . . . an administrative agency, or a local legislative body."); *Gisriel v. Ocean City Bd. of Supervisors of Elections*, 345 Md. 477, 496, 693 A.2d 757, 766 (1997) ("[W]hen a circuit court proceeding in substance constitutes ordinary judicial review of an adjudicatory decision by a[ ] . . . local legislative body, pursuant to a statute, ordinance, or charter provision, and the circuit court renders a final judgment within its jurisdiction, § 12–302(a) is applicable, and an appeal to the Court of Special Appeals is not authorized by § 12–301."); *Dep't of Gen. Servs. v. Harmans Assocs. Ltd. P'ship*, 98 Md.App. 535, 542, 633 A.2d 939, 943 (1993). The same question seems germane to Petitioner's appeal to the Court of Special Appeals in the present case. *But see Stuples v. Baltimore City Police Dep't*, 119 Md.App. 221, 242, 704 A.2d 518, 528 (1998), *cert. denied*, 349 Md. 495, 709 A.2d 140 (1998) ("[W]hen a circuit court sits in an appellate capacity to review a decision of an administrative agency and, on such review, vacates the agency decision and remands the matter to the agency for further proceedings, that action by the circuit court is now deemed to be an appealable final order within the contemplation of § 12–301."). As neither question as been raised or decided heretofore in this case, we shall not consider the implications further.

| | | | |
|---|---|---|---|
| 3/9/99 | Board adopts by resolution Growth Allocation Policy (the Policy), including apparent "appeal" opportunity from local growth allocation amendment action | | |
| 3/27/07 | Board approves by resolution growth allocation amendment proposal for Drayton Manor | | |
| 4/23/07 | Petitioners file petition for judicial review in Circuit Court for Kent County | | |
| 3/4/08 | Circuit Court affirms Board action on merits | | |
| 4/3/08 | Petitioners file appeal to Court of Special Appeals (COSA) | | |
| | | 6/4/08 | Panel of State Critical Area Commission recommends approval of County's proposed amendment, with revised conditions |
| | | 7/2/08 | Petitioners file petition for judicial review in Circuit Court for Anne Arundel County |
| 9/30/09 | COSA dismisses appeal because of prematurity in seeking judicial review of County's action that was not effective until State Commission acted on it | 10/16/09 | Case transferred to Circuit Court for Kent County |
| 12/1/09 | County amends the Policy to make "clear" that "appeal" is authorized only from final State approval of locally approved proposal to amend local plan | | |

12/18/09    Court of Appeals
            (COA) issues writ of
            certiorari

12/30/09    County moves in COA
            to dismiss case as moot
            in view of amended Pol-
            icy

1/11/10     COA defers ruling on
            motion to dismiss pend-
            ing oral argument

          3/8/10    Circuit Court, on State Com-
            mission's motion, dismisses
            petition as not authorized
            because State action was
            quasi-legislative; *no appeal
            to COSA taken*

9/8/10      Oral argument in Court
            of Appeals, during
            which no mention was
            made by parties (State
            Commission did not
            participate) of the exis-
            tence or disposition of
            the judicial review ac-
            tion from the State ac-
            tion

## ANALYSIS

### I. Is There a Statutory Right to Seek Judicial Review in This Case and, If So, from What Governmental Action?

■ A petition for judicial review proceeding in a circuit court must be authorized specially by a legislative enactment, be it a public local law or a State statute.[18] *See Dvorak v. Anne Arundel County Ethics Comm'n*, 400 Md. 446, 450, 929 A.2d 185, 187–88 (2007) ("[A]n examination of the relevant Maryland Code provisions and the legislative enactments of the subject local governmental body is necessary to determine

---

18. This case has been treated at all times and by everyone who has left fingerprints on it as a judicial review proceeding in accordance with the rules gathered under Title 7, Chapter 200 of the Maryland Rules of Practice and Procedure ("Judicial Review of Administrative Agency Decisions").

whether, in a given case, there is a right of appeal or judicial review from the final decision of an administrative body."); *Harvey v. Marshall,* 389 Md. 243, 273, 884 A.2d 1171, 1189 (2005) ("[I]n order for an administrative agency's action properly to be before this Court (or any court) for judicial review, there ... must be a legislative grant of the right to seek judicial review."). There is no provision in the State Critical Area Program regulatory scheme authorizing judicial review of either the local or State decisions to amend a county Critical Area plan or program. Thus, in the present case, the only possible legislative source purporting to supply such special authorization is the Kent County Policy, seemingly adopted initially by resolution of the County Commissioners on 9 March 1999, and amended by resolution on 1 December 2009.

Assuming that the Policy constitutes (or is the equivalent of) a public local law or ordinance sufficient to grant authority for a judicial review action,[19] we must determine

---

19. This is a point that we assume, but do not hold as such. As noted, the authority for initiation of a judicial review action must be granted specially by law, typically by a public local law (ordinance) or State statute. While Kent County's Critical Area Plan is incorporated in the County Code as part of its Land Ordinance, it is less clear where the Policy fits, if at all, within the hierarchy of the local law regarding the Kent County Critical Area Plan. All that we know from the parties' briefs, appendices, and the record extract is that, seemingly by resolution (and without reference therein to whether its terms became part of the Land Ordinance in the Kent County Code), the Board adopted the Policy in March 1999 and amended it in December 2009. At best, the Policy appears to take the form of a stand-alone "resolution." We couch this as "at best" because the initial Policy (at least the portions provided to us by the parties) does not use any permutation of the word "resolution" to describe itself. We contrast this with the 1 December 2009 amendment to the Policy which was framed as a "resolution" and contained the descriptor "resolved" throughout.

Assuming the Policy is a "resolution," the question remains whether a "resolution" may grant a right of judicial review of the assumed (for present purposes) quasi-judicial actions of a local government or administrative agency. That is, as noted *supra,* "in order for an administrative agency's action properly to be before this Court (or any court) for judicial review, there ... must be a *legislative grant* of the right to seek judicial review." *Harvey v. Marshall,* 389 Md. 243, 273, 884 A.2d 1171, 1189 (2005) (emphasis added).

from what governmental action—local or State—does the Policy grant the right to seek judicial review. Put simply, courts generally will review only a "final" decision of an agency.[20] *See generally* Rochvarg, *supra* § 4.5, at 110. An action is considered "final" when it "dispose[s] of the case by deciding all question[s] of law and fact and leave[s] nothing further for the administrative body to decide." *Willis v. Montgomery County*, 415 Md. 523, 534, 3 A.3d 448, 455 (2010); *see Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 666 n. 16, 851 A.2d 576, 588 n. 16 (2004). In the administrative context, more specifically, we have stated that "not every administrative order which determines rights and liabilities, or from which legal consequences flow, is final and thus subject to judicial review. Generally, to be final, an administrative order

The Kent County Code is silent as to whether a "resolution" of the Board of County Commissioners is a public local law. Maryland Code (1957, 2005 Repl.Vol.), Art. 25B, § 1 defines a "public local law"—the phrase thought of typically as synonymous with a legislative act of a local government—as "a law applicable to the incorporation, organization, or government of a code county and *contained in the county's code* . . . ." (Emphasis added). Further, Art. 25B, § 1's definition of "public local law" excludes specifically "resolutions of the county government enacted under public local laws." *See also* Md. Const. art. XI–F, § 1. Our search of the Kent County Code did not reveal that the Policy is contained in the County Code. Absent these "resolutions" adding expressly their terms to some existing or new local law (which they do not apparently), what is the legal effect of the resolutions? It is best not to decide this question until presented with a case in which the parties brief and argue this point fully. In any event, a finite answer need not be reached here because of another mortal illness afflicting the "patient."

**20.** Intertwined with the doctrine of finality is the doctrine of exhaustion of administrative remedies. It may be said fairly that when a litigant fails to exhaust his or her administrative remedies, he or she seeks judicial review of an agency action that is not "final." *See Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 658, 851 A.2d 576, 583 (2004) ("The issue raised . . . requires us to address . . . at what point during this potential chain of administrative decisions, judicial reviews and appeals can there be said to exist an administrative finality, *i.e.* an 'exhaustion' of administrative remedies."); *Md. Comm'n on Human Relations v. Downey Commc'ns., Inc.*, 110 Md.App. 493, 528, 678 A.2d 55, 72 (1996) ("The 'exhaustion' and 'finality' requirements both share the common goal of preventing potentially unnecessary and premature disruption by the courts of the activities of administrative agencies.").

must also leave nothing further for the agency to do." *Holiday Spas v. Montgomery County Human Relations Comm'n,* 315 Md. 390, 396, 554 A.2d 1197, 1200 (1989) (internal quotation marks omitted). Where, however, any remaining administrative procedures or processes are deemed "ministerial," the initial agency determination is reviewable immediately. *See, e.g., Foley v. K. Hovnanian at Kent Island, LLC,* 410 Md. 128, 159, 978 A.2d 222, 241 (2009); *City of Bowie v. Prince George's County,* 384 Md. 413, 443, 863 A.2d 976, 993 (2004).[21]

█ Applying these principles to the facts of the present case is a rather straightforward exercise. Under the Policy as it existed as of 9 March 1999 and as amended on 1 December 2009, it seems clear that effectively Petitioners, *at most,* had a facial right to seek judicial review of only the final approval action by the Commission.[22] This is so because, at all times,

---

**21.** Although we have not been directed by the parties to a comparable process in the Kent County Critical Area Plan, some Eastern Shore counties appear to treat as non-final in their plans even the Commission's approval action on the local growth allocation amendment, where the Commission modifies the conditions of approval appended by the local government to its action. This sort of provision has implications for the finality of action on a plan amendment application for purposes of judicial review, if judicial review is appropriate.

For example, Queen Anne's County appears to treat its local approval decisions on growth allocation petitions as purely "conceptual," unless and until the Commission acts on the County's conceptual approval. *See Foley v. K. Hovnanian at Kent Island, LLC,* 410 Md. 128, 133–34 n. 3, 978 A.2d 222, 225 n. 3 (2009); Queen Anne's County Code § 14:1–74(D) ("At their regularly scheduled meeting the County Commissioners shall evaluate the proposed amendment ... and either conceptually approve or disapprove the proposed amendment."). Moreover, Queen Anne's County's Critical Area Program contemplates that, once the Commission acts on the County's conceptual approval, the finality of that action depends on the County revisiting the petition to determine if it agrees with the Commission's action before the petition approval becomes effective. *See* Queen Anne's County Code § 14:1–74(F). Given the potential for differences between the County's conceptual approval (possibly with conditions) and the Commission's subsequent action (with possibly different conditions), such an approach seems prudent from the locality's vantage.

**22.** Assuming the Policy, for whatever reason, could not grant properly a right of judicial review from the local action on a growth allocation amendment request, Petitioners were not without recourse to the

the Policy stated expressly that no local approval action was effective until the Commission gave its approval (putting aside the potential need to reconcile any differences between the local and State approvals, such as exist in the present case). Further, the Commission may override ultimately the County's decision to approve a growth allocation request. In effect, the Commission's action may replace and supercede, or at least subsume, the local action where both actions, at their core, represent an approval. It cannot be said, then, that there is "nothing further for the administrative body [here, the Commission] to decide" or that the Commission's action on the growth allocation request is merely "ministerial." Accordingly, the County's approval of the growth allocation request was not a final and "appealable" action, and, thus, the Court of Special Appeals was correct to dismiss Petitioners' appeal, although the intermediate appellate court should have gone further and vacated the Circuit Court's judgment (on the merits of the County's approval) and remanded the matter to the Circuit Court with directions to dismiss Petitioners' judicial review action.[23, 24]

---

courts. Actions for declaratory and injunctive relief have been entertained as the modalities for challenges of the same or similar actions. *See, e.g., Foley*, 410 Md. at 128, 978 A.2d at 222; *Talbot County v. Town of Oxford*, 177 Md.App. 480, 936 A.2d 374 (2007); *North v. Kent Island Ltd. P'ship*, 106 Md.App. 92, 664 A.2d 34 (1995). A common law mandamus action also has been employed in like circumstances. *See, e.g., Talbot County*, 177 Md.App. at 492–93, 936 A.2d at 381.

**23.** To the extent the Policy, prior to the 1 December 2009 amendment— providing that "[a]ny aggrieved person with standing may within thirty (30) days after the decision, appeal to the Circuit Court of Maryland"— may be construed to grant a right to judicial review of the County action, because we hold here that the County decision is not a final and "appealable" administrative agency action, such a grant is ineffectual.

**24.** There is lurking in the shadows yet another reason why the Policy's allusion to a right of judicial review, if construed to be from the County's decision, may be ineffectual. As noted *supra* at p. 707, 18 A.3d at 24–25 and note 16, the proceedings and action before the Commission are deemed quasi-legislative in nature (rather than quasi-judicial) and, therefore, not amenable to judicial scrutiny through a petition for judicial review process. *See Gisriel v. Ocean City Bd. of Supervisors of Elections*, 345 Md. 477, 490 n. 12, 693 A.2d 757, 763 n.

## II. Is There Nonetheless An Appropriate Avenue of Relief for Petitioners in the Present Litigation?

There have been rare occasions in which we have ordered the stay of Circuit Court proceedings to await possible future exhaustion of available administrative remedies, *see Md. Reclamation Assocs., Inc. v. Harford County,* 382 Md. 348, 855 A.2d 351 (2004); however, we most often have dismissed such

12 (1997) ("Legislative or quasi-legislative decisions of local legislative bodies or administrative agencies are, of course, not subject to ordinary judicial review; instead, they are subject to very limited review by the courts."). That is why the Petitioners' judicial review action, initiated after the Commission purported to approve (on a different conditional basis) the County's approval of Drayton Manor's application, was dismissed. *See supra* at p. 707, 18 A.3d at 24–25. That judgment was not appealed.

In *Foley,* the aggrieved parties filed in the Circuit Court a complaint for declaratory and injunctive relief from the County Commissioner's final legislative action, which action was taken after resolving differences between the County's conceptual approval and the State's approval. *Foley,* 410 Md. at 136–37, 978 A.2d at 227. The litigation took the form of a declaratory judgment/injunctive action, rather than a petition for judicial review, because the final County action was characterized as "legislative," rather than quasi-judicial. *See Foley,* 410 Md. at 138, 978 A.2d at 228.

It seems a complicated analysis whether the County's consideration of Drayton Manor's application should be deemed a quasi-judicial or quasi-legislative process. No such analysis was attempted by the parties in the present case, presumably because this issue was not embraced fairly within the lone question for which a writ of certiorari was granted. *See supra* at p. 704, 18 A.3d at 22–23. The analysis is complex because: (a) the County's action represents an overlay zoning decision (somewhat akin to the Planed Unit Development (PUD) classification at the core of *Maryland Overpak Corp. v. Mayor & City Council of Baltimore,* 395 Md. 16, 909 A.2d 235 (2006)) by a local government possessed of delegated zoning and planning powers relative to a discrete parcel of land and based on a factual record measured against prescribed criteria; (b) the analytical template for such an inquiry set out in our opinion in *Overpak* may not be apt here because the only reason the County's process exists is as an homage to a State statutory requirement—the Critical Area regulatory scheme—that partakes clearly of broad and regional criteria that carry out State legislative policy, *see Overpak,* 395 Md. at 26 n. 10, 909 A.2d at 241 n. 10; and, (c) the developed caselaw characterizes the Commission's action and process in the Critical Area amendment scheme as quasi-legislative, which suggests that the County stage of the process also may be characterized similarly. *See supra* p. 707, 18 A.3d at 24–25 and note 16. Engage-

"premature" appeals. *See, e.g., Univ. Sys. of Md. v. Mooney,* 407 Md. 390, 413, 966 A.2d 418, 431 (2009); *Moose v. Fraternal Order of Police, Montgomery County Lodge 35, Inc.,* 369 Md. 476, 478, 800 A.2d 790, 791 (2002); *Josephson v. City of Annapolis,* 353 Md. 667, 669, 728 A.2d 690, 691 (1998); *Quesenberry v. Washington Suburban Sanitary Comm'n,* 311 Md. 417, 426, 535 A.2d 481, 485 (1988).

■ Assuming that the Policy grants an "appeal" (petition for judicial review) from the Commission's approval, arguably Petitioners had but a single statutory avenue of proceeding to pursue: a timely-filed petition for judicial review following the Commission's action.[25] Petitioners pursued such a remedy by filing a petition for judicial review in the Circuit Court for Anne Arundel County, which was transferred ultimately to the Circuit Court for Kent County. The Circuit Court agreed with the Commission's conclusion that Petitioners' petition for judicial review was not authorized because the Commission's process and action was quasi-legislative and dismissed the case. Because the Court of Special Appeals has no record of an appeal being taken by Petitioners from this dismissal—a fact of which we take judicial notice—Petitioners abandoned

---

ment with this question must await a future case, where the arguments are fully developed by parties.

**25.** This case is distinguished from *Maryland Reclamation Associates v. Harford County,* 382 Md. 348, 855 A.2d 351 (2004) *("MRA III ").* In *MRA III,* appellant, MRA, had two separate and consecutive statutory avenues by which it might have obtained relief, requesting an interpretation from the county Zoning Administrator whether the relevant and recently-enacted requirements of the zoning ordinance applied to its land use proposal and, if that failed to yield complete relief, seeking a variance of the requirements from the county Board of Appeals. *MRA III,* 382 Md. at 363, 855 A.2d at 360. The fact that MRA had two consecutive courses of action, neither of which MRA was constrained to pursue within a statutory time limitations period (unlike the 30 days to "appeal" the Petitioners had in the present case), was pivotal to this Court in fashioning the outcome in *MRA III. See MRA III,* 382 Md. at 367, 855 A.2d at 362 (*"When a litigant is entitled to bring two separate legal proceedings in an effort to obtain relief in a particular matter,* when the litigant institutes the first of those proceedings and the case is pending in a trial court, and when the trial court is unable to decide the merits of that case because of primary jurisdiction or exhaustion principles associated with the second proceeding, the trial court ordinarily should stay the first proceeding for a reasonable period of time.").

the only "right" to judicial review arguably afforded by the Policy.[26]

Petitioners' predicament may be likened to that of Chrys Wilson, in *Public Service Commission of Md. v. Wilson,* 389 Md. 27, 882 A.2d 849 (2005). Wilson, an employee of the Public Service Commission ("PSC"), was fired by the Chair of the PSC. *Wilson,* 389 Md. at 34, 882 A.2d at 853. Based on an opinion letter ruling of the State Attorney General's Office concluding that the Chair, acting alone, lacked authority to fire her (the opinion concluded that at least a majority vote of the full Commission was required), Wilson noted timely an administrative appeal from her termination. *Wilson,* 389 Md. at 35–36, 882 A.2d at 854. Under the PSC's administrative appeal procedure, such appeals were to the Chair. *Id.* To no one's surprise, the Chair sustained his decision to fire her. *Wilson,* 389 Md. at 37, 882 A.2d at 855. Wilson filed a ten-count complaint in the Circuit Court for Baltimore City seeking declaratory and injunctive relief. *Id.* The Circuit Court, agreeing with Wilson's argument as to the Chair's lack of authority, ordered her reinstatement. *Wilson,* 389 Md. at 39, 882 A.2d at 856. Her restoration was short lived. The full Commission promptly met and voted to terminate her. *Id.* Rather than file an administrative appeal from the second termination, as provided for by law, Wilson chose to petition the Circuit Court to find the PSC in contempt of the court's order in the earlier litigation. *Wilson,* 389 Md. at 40, 882 A.2d at 857.

This Court found that Wilson's failure to pursue in timely fashion (within 15 days of being notified of the second firing) the statutorily-prescribed administrative remedy for challenging her second termination barred further litigation of any of her claims (be they constitutional, statutory, and common law) under exhaustion of remedies principles. *Wilson,* 389 Md. at 93, 882 A.2d at 888. Petitioners in the present case, by failing to pursue an appeal to the Court of Special Appeals from the

---

26. *But see supra* note 17.

Circuit Court's dismissal of their judicial review proceeding taken from the Commission's "final" action, would be barred similarly from challenging that "final" action in the present case were it remanded (and for other reasons argued by the Commission in its amicus brief here). To allow Petitioners to resuscitate these proceedings in the Circuit Court would be to give them an unwarranted additional bite at the proverbial apple, especially where the Commission's approval subsumed the County's approval. Petitioners exhausted whatever facial right they may have had to seek judicial review of the State's action when they filed the second judicial review action—the review of the Commission's decision—and then failed to seek appellate review in the Court of Special Appeals of the Circuit Court's dismissal of that action.

Although the path to trod was not as clear for Petitioners here as for litigants in other administrative agency decisional contexts, a way was not so concealed by legal thickets that it could not be discerned, *i.e., see supra* note 22. *Anderson House, LLC v. Mayor & City Council of Rockville,* 402 Md. 689, 939 A.2d 116 (2008), albeit in a different context, illustrates how an analogous confoundment of how to proceed may be approached. In *Anderson House,* a property owner aggrieved by a zoning text amendment to the City of Rockville's zoning ordinance creating a new zone and an accompanying comprehensive rezoning of its property to the new zone, hedged its bet by filing first a petition for judicial review (which the City moved to dismiss) and later a "protective" complaint for Declaratory Judgment and Injunctive Relief. *Anderson House,* 402 Md. at 702–01, 939 A.2d at 123. We parsed the propriety of the modalities of each action according to the nature of the actions (legislative versus quasi-judicial) for which judicial scrutiny was sought and applicable law. *See Anderson House,* 402 Md. at 707, 939 A.2d at 127.

There is no denying that the Critical Area regulatory scheme, combining local and State responsibilities to be carried out according to potentially varying criteria, creates complex administrative law problems from time-to-time. The present case illustrates that. The case also raises more

questions than may (or should) be answered on its record and briefs. Future litigants in such cases would do well to consider the unanswered questions as they make the record in their cases.[27]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS THE APPEAL, VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY, AND REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS THAT IT DISMISS PETITIONERS' PETITION FOR JUDICIAL REVIEW; COSTS TO BE PAID BY PETITIONERS.**

---

**27.** If I understand the result that the Dissenting Opinion argues for in this case, were its views to prevail, the ultimate pyrrhic victory would obtain. First, it is a given that Petitioners forfeited any further ability to challenge directly the only arguably final governmental action in this case, the State Critical Area Commission's approval of an amendment to the Kent County Critical Area Plan to reflect the growth allocation for Drayton Manor's development proposal. That fact notwithstanding, the Dissent would return to the Circuit Court Petitioners' instant judicial review action regarding the County Board's decision, where, having had its prior affirmance, on the merits, of the County Board's approval vacated by the Dissent for prematurity, the Circuit Court effectively would be tasked with reconsidering, on the merits, the County's approval. Of course, the "stay" which the Dissent argues should have been entered before the Circuit Court decided the present litigation earlier (although no stay was requested by Petitioners in the Circuit Court) would have no effect on the record or legal arguments before the Circuit Court, which remain static as of the point in time immediately prior to the vacated affirmance on the merits. Moreover, the predicate of the Dissent's perceived "prematurity" of the Circuit Court's prior affirmance, premised as it must be on the concurrent or continuing ability of Petitioners to pursue a legal challenge to the State Commission's action, ceased to exist when Petitioners failed to appeal to the Court of Special Appeals the Circuit Court's disposition of their judicial review action regarding the State Commission's decision.

So, at best, what the Dissent would have done here is have the Circuit Court reconsider its ruling on the merits, based on the same record and same legal arguments on which it affirmed previously the County Board's decision. Because hope springs eternal in the human breast, I suppose it is not beyond the pale for Petitioners to hope for an epiphany on the part of the Circuit Court judge, but the odds do not seem at all promising. Perhaps, under a different set of circumstances, the principles marshaled in the Dissenting opinion might have been applicable and made a difference; here, it appears they do not.

Judge BATTAGLIA joins in the judgment only.

BELL, C.J., GREENE, and ADKINS, JJ., Dissent.

ADKINS, J., dissenting, in which BELL, C.J., and GREENE, J., join.

I respectfully dissent because I believe the majority opinion achieves a new low point in the unfortunate strain of unfair, "gotcha" jurisprudence which has entered our finality and administrative exhaustion case law. I agree with the majority that the Circuit Court should not have reviewed the County's decision until after the State Commission proceeding was completed. I disagree, however, that we should dismiss this appeal. The majority concludes that the Petitioners should have filed a judicial review action at a later point in time, barely acknowledging the requirement in the local procedures that an appeal must be taken "within thirty (30) days after the [County's] decision[.]" *See Kent County Growth Allocation Policy* (adopted March 9, 1999). Because I would, instead, remand this case to the Circuit Court, I dissent.

### "Stay" of a judicial review action as an alternative to dismissal.

The appropriate disposition of a prematurely filed review action depends, at least in part, on the reason that action is premature. The requirements of finality and administrative exhaustion serve two important purposes. First, these requirements screen out requests for judicial review of non-final agency decisions. Second, the requirements serve as an "ordering function," delaying review of certain "final" agency decisions until other administrative processes have been exhausted. Although immediate judicial review of a decision is prohibited in both of these categories, distinguishing between the two is important when deciding how to dispose of the premature review action—i.e., whether to dismiss the case or grant a stay.

When the challenged administrative decision is a *preliminary* or *non-final* decision, dismissal is warranted. In these decisions, there is something incomplete in the challenged

decision itself, which will later be superseded or subsumed in a looming, final agency decision. Any complaints that a party has with the *preliminary* decision may be raised in a challenge to the final agency decision, if they survive. The preliminary decision, then will *never* be subject to judicial review, and the court has no reason to retain jurisdiction.

For example, in *Maryland Comm'n. on Human Relations ("MCHR") v. Baltimore Gas & Electric Co.*, 296 Md. 46, 459 A.2d 205 (1983) ("BG & E"), the Maryland Commission on Human Relations's Appeal Board determined that BG & E's refusal to hire the spouse of an employee was discriminatory on the basis of marital status, but remanded to a hearing examiner to determine whether the discrimination was motivated by "business necessity," and thus justified by Maryland law. *See id.* at 49, 459 A.2d at 208. BG & E appealed this order to the Circuit Court, and the case eventually reached this Court on the issue of finality. We held that the appeal was premature, and ordered dismissal of the judicial review action. Judicial review would instead lie from the ensuing administrative decision on business necessity, and any issue with the prior decision could be raised in that proceeding. Dismissal ensured that "the efficiency of the unconsummated administrative process is not undermined by premature judicial interruption." *Id.* at 58, 459 A.2d at 213. *See also Willis v. Montgomery County*, 415 Md. 523, 535, 3 A.3d 448, 455–56 (2010) (dismissing judicial review action of agency's refusal to refer a worker's compensation case to fraud division; the County was later able to seek compensation for the alleged fraud through another agency proceeding, from which appeal would lie). *Cf. Soley v. State Commission on Human Relations*, 277 Md. 521, 526, 356 A.2d 254, 257 (1976) (dismissing declaratory judgment action alleging ultra vires actions by State Commission on Human Relations because any judicial review must lie from the administrative remedy, not in a declaratory judgment action).

In many cases, however, judicial review of an agency decision is premature only because other administrative remedies exist, and *not* because the decision is a preliminary or non-

final decision. When judicial review of an agency decision is delayed to allow for exhaustion of administrative remedies, it is for practical considerations, and not because of a jurisdictional defect. *See Hubbard,* 305 Md. 774, 787, 506 A.2d 625, 631 (1986) (Failure to exhaust a primary administrative review remedy "does not ordinarily result in a trial court's being deprived of fundamental jurisdiction[.]"); *Towson Univ. v. Conte,* 384 Md. 68, 122 n. 4, 862 A.2d 941, 972 n. 4 (2004) (Eldridge, J., dissenting) ("Exhaustion of a required administrative/judicial review remedy is ordinarily not a 'jurisdictional' matter or a 'jurisdictional requirement' under Maryland law.").[1]

In these cases, the "exhaustion" requirement is a mere ordering function which, like a traffic cop, decides when the different avenues of review may proceed:

> [W]here the General Assembly has provided an administrative remedy and there also exists an independent judicial remedy, and no statute coordinates the two or specifies which is primary, we have ordinarily construed the pertinent enactments to require that the administrative remedy be first invoked and followed.

---

1. The pragmatic flexibility of the exhaustion rule is further demonstrated in *Md.–Nat'l Capital Park & Planning Comm'n. v. Crawford,* 307 Md. 1, 17–18, 511 A.2d 1079, 1087 (1986), a case representative of our procedural approach in an administrative exhaustion case. There, an employee at Maryland–National Capital Park and Planning Commission was aggrieved by a personnel decision. *See id.* at 7, 511 A.2d at 1081–82. She initiated an administrative grievance and, while that was pending, filed a lawsuit in the Circuit Court for Prince George's County. *See id.* The court assumed jurisdiction over the matter while the administrative action was pending, and disposed of some preliminary, evidentiary matters in the case. After the administrative process was completed, the court held a trial on the merits regarding the initial decision. *See id.* at 8, 511 A.2d at 1082. Although the judicial action was filed "prematurely," and the employee had not sought judicial review and consolidation of the second administrative decision, we approved of the court's approach, stating that "the court properly applied any exhaustion requirement in its handling of the case." *Id.* at 16, 511 A.2d at 1087. *Crawford* thus demonstrates that administrative exhaustion is a common-sense requirement concerned with the ordering of appeal procedures, and not a jurisdictional prerequisite.

*Board of Educ. v. Hubbard,* 305 Md. 774, 786, 506 A.2d 625, 630–31 (1986). *See also Josephson v. City of Annapolis,* 353 Md. 667, 675–677, 728 A.2d 690, 694–695 (1998) ("[T]he administrative remedy is intended to be primary" even where the Legislature has not "specifi[ed] that the administrative remedy is primary or exclusive."). This "agencies first" rule promotes judicial efficiency and protects the exercise of agency expertise:

> The decisions of an administrative agency are often of a discretionary nature, and frequently require an expertise which the agency can bring to bear in sifting the information presented to it. The agency should be afforded the initial opportunity to exercise that discretion and to apply that expertise. Furthermore, to permit interruption for purposes of judicial intervention at various stages of the administrative process might well undermine the very efficiency which the Legislature intended to achieve in the first instance. Lastly, the courts might be called upon to decide issues which perhaps would never arise if the prescribed administrative remedies were followed.

*Soley v. State Commission on Human Relations,* 277 Md. 521, 526, 356 A.2d 254, 257 (1976). *See also Wilson,* 286 Md. at 645, 409 A.2d at 717 ("[W]hen the Legislature enacts a comprehensive remedial scheme in which a claim is to be determined by an administrative agency and reviewed in an administrative appeal before judicial review is available, it establishes, as public policy, that such a procedure produces the most efficient and effective results.").

Accordingly, in some instances of premature appeal, we have ordered the Circuit Court to retain jurisdiction so as to allow the remaining administrative processes to run their course. For example, in an exhaustion case involving the Inmate Grievance Commission, we stated:

> Although the circuit court in this case correctly held that McCullough was required to invoke and exhaust his remedy before the Inmate Grievance Commission before receiving an adjudication on the merits of his tort action, we do not believe that a dismissal of the tort action was the preferable

order. Under circumstances like these, where a plaintiff has both an administrative remedy and an independent judicial action, and the administrative agency's jurisdiction is deemed primary, it is appropriate for the trial court to retain, for a reasonable period of time, jurisdiction over the independent judicial action pending invocation and exhaustion of the administrative procedures.

*McCullough v. Wittner,* 314 Md. 602, 612–13, 552 A.2d 881, 886 (1989). *See also Maryland Reclamation Assocs. v. Harford County,* 342 Md. 476, 490–491, 677 A.2d 567, 574–575 (1996) (constitutional challenge to local zoning ordinance must await completion of two administrative zoning actions); *State v. Md. BCA,* 364 Md. 446, 773 A.2d 504 (2001) ("[T]he Circuit Court should have refrained from reaching the issue at this stage, and should have stayed the declaratory judgment action pending a final decision by the Board of Contract Appeals."); *Board of Educ. for Dorchester County v. Hubbard,* 305 Md. 774, 506 A.2d 625 (1986) ("Optionally the circuit courts, . . . may in their discretion order that the status quo be maintained and may retain jurisdiction for a reasonable period to give the teachers an opportunity to exhaust their administrative remedies and obtain a final decision from the State Board of Education.").

The "stay" remedy, as an alternate to dismissal, serves an important purpose. Administrative appeals and judicial reviews usually must be filed within specific mandatory time periods established by statute or rule of procedure. When a party is involved in complicated administrative proceedings, and also needs to seek judicial review, these filing deadlines may conflict, or the party may be practically unable to exhaust its remedies before the appeal deadline has passed. In order to protect its right to seek judicial review, therefore, the party may need to file a judicial review action prematurely. If the reviewing court then were to dismiss the review action, the party could be frozen out of its right to appeal.[2] *See, e.g.,*

---

**2.** A party could seek to protect aspects of its case other than its timeliness. In *Crawford,* for example, the litigant was concerned over

*Mathirampuzha v. Potter*, 548 F.3d 70, 84 (2nd Cir.2008) (dismissal, instead of issuing a stay, would create a "significant danger of unfair disadvantage here inasmuch as the plaintiff's claim is subject to a statute of limitations."); *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 222–24, 86 S.Ct. 781, 787–88, 15 L.Ed.2d 709 (1966) (ordering stay, not dismissal, despite a failure to exhaust administrative remedies because the initial action was "subject to the Statute of Limitations and [is] likely to be barred by the time [of the final administrative decision.]"). As these cases demonstrate, the "stay" remedy serves to alleviate harsh outcomes when our finality and exhaustion requirements interface poorly with other procedural requirements in administrative appeals.

To be sure, the requirement that a party exhaust all administrative remedies can develop into an absolute bar requiring dismissal. This harsher treatment occurs, however, *only when a party fails to take the steps required by our exhaustion principles*. *See, e.g., Public Service Comm'n. v. Wilson*, 389 Md. 27, 882 A.2d 849 (2005). In *Wilson*, for example, an employee of the Public Service Commission ("PSC") had been fired by the Chair of the PSC, and then reinstated after the Circuit Court for Baltimore City held that the Chair lacked the authority to fire her without a vote of the full PSC. After reinstatement, she was fired again, but this time by the required vote. By statute, an employee of the PSC could file "a written appeal of a disciplinary action with the head of the principal unit[,] ... within 15 days after the employee receives notice[, and] ... on the grounds that the disciplinary action is illegal or unconstitutional." Md.Code (1993, 2004 Repl.Vol.), § 11–113(b) of the State Personnel and Pensions Article. Wilson did not file an administrative appeal, "opting instead to

potential alteration or influence of potential testimony, and sought preliminary injunctive relief from the Circuit Court before exhausting her administrative remedies. *Crawford*, 307 Md. at 8, 511 A.2d at 1082. If we had treated the exhaustion requirement as a jurisdictional prerequisite, and ordered dismissal of a case filed during the pendency of administrative exhaustion, the litigant in *Crawford* would have been unable to seek this type of evidentiary protection.

file in the pending court action[.]" *Wilson,* 389 Md. at 40, 882 A.2d at 857. The Court held that this "choice" foreclosed any potential relief: because she "allowed the relevant time period to expire without following the statutory directive under § 11–113[,]" she failed to satisfy the exhaustion requirement and was unable to "seek alternative redress in the Circuit Court." *Id.* at 40, 882 A.2d at 857. Thus, the exhaustion requirement serves to deny relief for parties who sit on their rights to administrative review. Put differently, a party may not opt for judicial review by waiting out administrative review deadlines. *See State Ret. & Pension Sys. of Md. v. Thompson,* 368 Md. 53, 792 A.2d 277 (2002) (retiree's failure to request a hearing to contest decision by State Retirement and Pension Board was a failure to exhaust administrative remedies); *Md. Reclamation Assocs.,* 382 Md. at 361, 855 A.2d at 358 (commenting, in remand for further agency procedures, that "[f]ailure to prosecute variance applications within a reasonable time could result in dismissal[.]").

To apply the above standards to the instant case, a careful examination of the "premature" appeal is required. The Growth Allocation process consists of two, distinct decisions, one at the local level and one at the state level. As all parties agree, the state and local decisions involve separate issues and involve separate evidence, though overlapping on the general standards of the State Critical Areas Act. The County decision is primarily concerned with the effect of the proposed growth allocation on local interests, while the State is concerned with the proposal's effect on the statewide regulatory scheme and the overall health of the State's water resources. For example, the State Commission will not determine whether the growth allocation will "expand and provide more diversity in the size, number, and type of businesses in Kent County or as a means to enhance and expand locally based tourism that relies upon the unique natural, cultural, and historic features and qualities of Kent County."

The County's decision is not subsumed by the State's decision, and judicial review of that decision lies separately from judicial review of the State decision. Indeed, when exhaustion

of administrative remedies has not been at issue, "[i]t [has] not [been] unusual for an aggrieved person to petition for judicial review of a local government's decision on a program amendment (including a growth allocation) before the Critical Areas Commission has acted on the local government's [submission].[3] *See Brief of Amicus Curiae Critical Area Commission for the Chesapeake and Atlantic Coastal Bays,* 11 n. 8.

The County's decision thus falls into the second category of decisions for which judicial review is *delayed, rather than extinguished,* by our exhaustion principles. If administrative exhaustion was the only procedural concern, then we could fairly require aggrieved parties to await the State decision before filing a judicial review action of the local decision.

In this case, however, review of a Kent County growth allocation decision is also subject to the procedural requirements of the Kent County Growth Allocation Policy, which specifies that "[a]ny aggrieved person with standing may within thirty (30) days after the [County's] decision, appeal to

---

3. The Critical Areas Commission offers the following examples:

[I]n the Four Seasons project growth allocation, separate actions were filed against the Queen Anne's County Commissioners and the Critical Area Commission by Robert Foley and the Kent Island Defense League. In 2006, the Critical Area Commission denied a growth allocation for the Blackwater Resorts project, which had been approved by Dorchester County and the City of Cambridge. Aggrieved parties challenged the local governments' approvals of the growth allocation, and subsequently, the County and the developer challenged the Critical Area Commission's denial of the same growth allocation. In 2007, the AES LNG Corporation filed an action against Baltimore County when the County enacted an ordinance pertaining to LNG facilities in the Critical Area. *AES Sparrows Point LNG, LLC v. Smith,* 527 F.3d 120 (2008) *cert. denied,* [— U.S. —] 129 S.Ct. 310 [172 L.Ed.2d 153] (2008). While that case was pending in the United States Court of Appeals for the Fourth Circuit, the Critical Areas Commission approved the County's ordinance as an amendment to the critical area program. AES then filed an action for declaratory judgment against the Commission. *AES Sparrows Point LNG, LLC et al. v. Critical Area Commission for the Chesapeake and Atlantic Coastal Bays et. al.,* No. 02–C07–123926, Cir. [Ct.] Anne Arundel County.

Brief of Amicus Curiae Critical Area Commission for the Chesapeake and Atlantic Coastal Bays at 11 n. 8.

the Circuit Court of Maryland." Given the reality that the State Commission is highly unlikely to complete its review within 30 days, the Policy effectively requires a pre-exhaustion filing. This potential conflict is *exactly* the procedural problem which has led many courts to conclude that a stay is superior to a dismissal.

When our exhaustion requirement delays, rather than extinguishes, judicial review of an administrative decision, and that delay may interfere with a filing deadline, the stay remedy allows the party to protect its right to judicial review of the local decision. In this case, with the 30–day appeals deadline looming, the Petitioners were at risk of losing their right to judicial appeal of the local decision. We should, instead of dismissing this appeal, vacate the Circuit Court's premature decision on the merits, and remand to that court for further proceedings. *See Md. BCA,* 364 Md. at 459, 773 A.2d at 512 (after Circuit Court reviewed the merits of an administrative action prior to exhaustion, this Court vacated that decision and remanded for further proceedings).

Rather than follow this common-sense approach, the majority dismisses the appeal and abrogates the Petitioners' right to challenge the County's decision. The majority justifies its dismissal with three problematic assertions: (1) that this case is distinguishable from *MRA III,* (2) that the Petitioners are instead like the disappointed litigant in *Public Service Commission of Md. v. Wilson,* 389 Md. 27, 882 A.2d 849 (2005), and (3) that the Petitioners abandoned their right to appeal by failing to appeal the Circuit Court's dismissal of its action for judicial review of the State Commission decision.

The majority's decision contradicts the approach adopted by the Court in *MRA III,* in which Judge Harrell explained:

When a litigant is entitled to bring two separate legal proceedings in an effort to obtain relief in a particular matter, when the litigant institutes the first of those proceedings and the case is pending in a trial court, and when the trial court is unable to decide the merits of that case because of primary jurisdiction or exhaustion principles

associated with the second proceeding, the trial court ordinarily should stay the first proceeding for a reasonable period of time.

See *MRA III*, 382 Md. at 367, 855 A.2d at 362. Here, no one disagrees that Petitioners are "entitled to bring two separate legal proceedings in an effort to obtain relief": a judicial review action of the County decision and an administrative challenge at the State level. The Petitioners "institute[d] the first of those proceedings and the case [was] pending in a trial court[.]" No one disagrees that "the trial court [was] unable to decide the merits of that case because of primary jurisdiction or exhaustion principles associated with the second proceeding[.]" This case thus aligns with *MRA III*, and Petitioners are perfect candidates for a remand.

The majority makes only a half-hearted attempt to distinguish *MRA III*, stating:

This case is distinguished from *Maryland Reclamation Associates v. Harford County*, 382 Md. 348, 855 A.2d 351 (2004) ("*MRA III* "). . . . The fact that MRA had two consecutive courses of action, neither of which MRA was constrained to pursue within a statutory time limitations period (unlike the 30 days to "appeal" the Petitioners had in the present case), was pivotal to this Court in fashioning the outcome in *MRA III*.

The majority thus concludes that the 30–day appeal limitation in this case requires a departure from the "stay" remedy of *MRA III*. I could not disagree more.

If anything, the 30–day window makes Petitioners better candidates for remand than the party in *MRA III*. In *MRA III*, the party was free to refile after exhaustion; here, without a remand, the Petitioners are time-prohibited from refiling any appeal of the County decision. This majority's holding thus ignores one of the main purposes of the stay remedy—to allow a party facing deadlines (be it administrative deadlines or statutes of limitations) to protect its right to appeal by filing an action for judicial review *prior to exhaustion.*

The majority then concludes that "the Petitioners' predicament may be likened to that of Chrys Wilson," an administrative litigant whom this Court found had lost her right to further challenge an administrative decision. The similarities between the Petitioners and Ms. Wilson are scarce. To be sure, both were aggrieved at an administrative decision; in *Wilson*, Ms. Wilson was fired by the PSC, and here, the County granted a growth allocation. Both were required to pursue another administrative review: in *Wilson*, the statute required an aggrieved employee to file an administrative appeal, and here, the Petitioners had to contest the growth allocation in front of the State Commission.

But that is where the similarities cease. Ms. Wilson was required, by statute, to file an administrative grievance within 15 days. She failed to do so, and instead chose to file a judicial review action. In contrast, the Petitioners were required, by statute, to file a **judicial review** action within 30 days, which they did. Furthermore, while Ms. Wilson's administrative remedy was never exhausted due to her failure, the Petitioners' administrative remedy (the State Commission review) proceeded automatically and was duly completed. *Wilson* establishes that the administrative exhaustion requirement may become a bar to judicial review if not satisfied. But here, unlike *Wilson*, the required administrative proceeding was completed. Thus, none of the justifications for the dismissal in *Wilson* apply here.

Finally, the majority faults the Petitioners' failure to appeal the Circuit Court's dismissal of its action for judicial review of the State Commission decision:

> Assuming that the Policy grants an "appeal" (petition for judicial review) from the Commission's approval, arguably Petitioners had but a single statutory avenue of proceeding to pursue: a timely-filed petition for judicial review following the Commission's action. Petitioners pursued such a remedy by filing a petition for judicial review in the Circuit Court for Anne Arundel County, which was transferred ultimately to the Circuit Court for Kent County. The Circuit Court agreed with the Commission's conclusion that

Petitioners' petition for judicial review was not authorized because the Commission's process and action was quasi-legislative and dismissed the case. Because the Court of Special Appeals has no record of an appeal being taken by Petitioners from this dismissal—a fact of which we take judicial notice—Petitioners abandoned the only "right" to judicial review arguably afforded by the Policy.

This conclusion is startling.

In the above passage, the majority considers the "single statutory avenue" of judicial review, under the policy, to be a judicial review action following the State Commission's decision. Yet, in the same breath, the majority acknowledges that it is unsettled whether such an action is permissible: "The Circuit Court agreed with the Commission's conclusion **that Petitioners' petition for judicial review was not authorized** because the Commission's process and action was quasi-legislative." (emphasis added). Thus, while denying the Petitioners the avenue to go forward with their timely filed appeal from the County decision, it refrains from holding that Petitioner had any right to appeal from the State Commission. Moreover, the majority fails to address (1) whether the Petitioners could raise issues unique to the County decision in its challenge to the State decision, and (2) whether the Petitioners could have re-filed a separate challenge to the County decision, within 30 days of the State decision, even though this current appeal was pending. Thus, the majority decision leaves the law regarding judicial review of Growth Allocation requests in a muddled state.

At the same time, the majority applies the harshest standard to Petitioners—expecting that they be prescient. Under this harsh standard, Petitioners must have been able to correctly predict the following uncertainties: (1) that this Court, departing from *MRA III* and other cases, would not honor their timely effort to appeal from the County decision as called for under the Kent County Growth Allocation Policy, (2) that they had a right to judicial review of the State Critical Area Commission decision, (3) that they should raise all of the issues pertaining to the County decision in the possible appeal

from the State Commission to the circuit court, and (4) that they had a right and obligation to appeal from the Circuit Court to the Court of Special Appeals, raising questions unique to this, earlier filed appeal from the County Growth Allocation decision, even though this appeal was pending.

The majority admits that my concerns may be "applicable and [make] a difference" in future cases, but concludes that it is useless to vacate and remand in this case, because the Circuit Court has already reached the merits. Perhaps, as the majority suggests, the Circuit Court would reach the same result on remand. I would risk this "pyrrhic victory" rather than unfairly deprive the Petitioners of their day in court. We should respect the efforts of lawyers in the trenches, who must discern the meaning of complicated and conflicting regulations. The principles of fairness and reasonable conduct demand this. Otherwise, by adopting unnecessarily harsh procedural rules and interpretations, we reinforce the "gotcha" approach that has descended upon our jurisprudence.

Petitioners took reasonable and diligent steps to preserve their right to have a court review the County's decision. Accordingly, I would vacate the Circuit Court's premature decision and remand to that court for further proceedings.

Chief Judge BELL and Judge GREENE have authorized me to state that they join this dissenting opinion.